## WILLIAMS v. WARE et al.

No. 21965.     April 3, 1934.

Everest, McKenzie, Halley & Gibbens, for plaintiff in error.

Shirk, Danner and Phelps, for defendants in error.

PER CURIAM. This action was commenced in the district court of Oklahoma County by Mrs. George K. Williams against A. C. Ware and others. The case was tried to the court without the intervention of a jury, and at the conclusion of the trial the court made findings of fact and conclusions of law and rendered judgment for defendants, from which the plaintiff has appealed. The parties will be referred to as they appeared in the trial court.

The plaintiff states she was owner of an oil and gas lease covering 20 acres of land in Oklahoma county, which lease contained the following provision, to wit:

"If no well be commenced on said land on or before the 11th day of September, 1929, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in the Capitol Hill Capital State Bank at Oklahoma City, Okla., or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of $20, which shall operate as a rental and cover the privilege of deferring the commencement of a well for 12 months from said date."

On the 12th day of September, 1929, the rental, as above referred to, had not been paid, and defendants Ware elected to declare the lease forfeited. On September 14, 1929, plaintiff filed her action, praying that defendant be required to accept the delayed rentals, and the court declare the lease in full force and effect. The defendants Ware filed their answer and cross-petition, denying the allegations of plaintiff's petition, and praying for judgment removing the purported lease as a cloud from their title. Plaintiff states in her petition that she was owner and holder of the lease by assignment, copies of the lease and assignment being attached marked exhibits "A" and "B," respectively. The lease provided for payment of delay rentals of $20 on or before the 11th day of September, 1929, to the lessor or deposit the same to the lessor's credit in the Capital State Bank at Oklahoma City. That on or about the 30th of August, 1929, the Capital State Bank, aforesaid, through its officers or employees, advised the agent of plaintiff, who was Mrs. Betty Gish, that the records of said bank showed payment of said rental in the sum of $20 to have been made during the month of May, 1929. The plaintiff left Oklahoma City during the month of May, 1929, and her agent, Betty Gish, depended upon the statements given her by the officers or employees of said bank that the rental, which was due September 11, 1929, under the lease, had been paid, and that her said agent was not advised that the rental had not been paid until September 12, 1929, and that plaintiff was misled by the officers or employees of the bank by advising plaintiff's agent that the rentals had been paid. Upon learning that the rental due to the lessor under said lease had not been paid on the 12th of September, 1929, the plaintiff caused to be tendered to the defendant Capital State Bank, as depository, her check in the sum of $20 in payment of the rentals, which said bank refused, and thereupon the plaintiff caused said check to be tendered to the defendants, Ware and wife, which was refused. On September 14, 1929, plaintiff caused to be tendered to said bank the sum of $20 in money in payment of said rental due September 11, 1929, which was refused. Plaintiff alleges that she has used due diligence in an effort to pay the delay rental under the terms of said lease, but was misled by the statement of the officers or employees of the defendant bank to her agent, Betty Gish, that said delay rental had been paid prior to September 11, 1929, and plaintiff charged that in equity she was entitled under the facts to be permitted to pay such rental and continue in full force and effect all of the terms of said lease.

The defendants A. C. Ware and Anna D. Ware filed an answer and cross-petition, in which said defendants deny the allegations of the petition, except admitting execution of the lease and the same provided for rentals in the sum of $20 to be paid on or before September 11, 1929. Defendants denied that the rental of $20 was paid or tendered to them, or to the bank, or that effort was made to pay the same on or before September 11, 1929, but charged that no payment or offer of payment or effort to make payment was ever made prior to September 12, 1929, on which date the defendants advised that they, as owners of the property, had elected to cancel the lease for nonpayment of the delay rental, whereupon effort was immediately made to force defendants to accept payment of the delay rental and

to force the defendant bank to accept the same, which was refused. Defendants charged that plaintiff and her agent knew that the delay rentals had not been paid, and that plaintiff intentionally, negligently, or otherwise failed and refused to pay rental as provided; that about September 12th, 13th, and 14th, defendants advised plaintiff that they considered the lease terminated under its provisions and they desired a release from plaintiff in order to remove the cloud from the title.

On October 10, 1929, the defendant Capital State Bank filed an answer denying all the allegations except admitting that it was the depository; denied that the rentals were tendered, paid, or that an effort was made to pay same on or before September 11, 1929, and denied that the agent of plaintiff was advised by this defendant, its officers, agents, or, employees prior to September 12, 1929, that the rental had or had not been paid, but charged that no effort was made to pay the rental until after September 12, 1929, when payment was refused.

Plaintiff thereafter filed reply to the cross-petition denying the allegations. On January 20, 1930, the case was heard and the court rendered judgment for defendants Ware on their cross-petition for cancellation of the lease. Motion for new trial was heard and overruled January 27, 1930, exceptions reserved, and appeal perfected, which is before this court upon the following assignments of error, to wit:

"First: Said court erred in overruling the motion of plaintiff in error for new trial.

"Second: Said court erred in not rendering judgment for the plaintiff in error on the findings of fact.

"Third: Said court erred in its conclusions of law based on the findings of fact."

By the terms of the lease in controversy, the lessee acquired a vested right to explore for oil and gas until September 11, 1929, with an option to renew the term for successive annual periods, not exceeding five years from the date of the lease. This lease is, in fact, a lease from year to year, not exceeding five years. The payment of the rental was a necessary condition precedent to the renewal of the lease from year to year as specified in the lease contract. After execution and delivery of the lease, the lessee, so long as the rentals were paid in the manner provided, had an option to continue the lease in force, but for not more than five years without drilling a well.

Quoting from the case of Brennan v. Hunter, 68 Okla. 112, 172 P. 49, which is referred to by this court with approval in the case of Garfield Oil Co. v. Champlin, 78 Okla. 91, 189 P. 514, this court said:

"The lease in the instant case explains fully the nature and extent of the interest passed to the lessee; that is, the lessor grants, demises, leases and lets unto the lessee for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines, and of building tanks, towers, stations and structures thereon, to produce, save and take care of said products. The lease by its express terms would terminate unless a well was completed on the land on or before August 23, 1916. The rental provision granted an option to the lessee. That is, that by the payment of the rentals the time for completing the well would be extended another six months. It is immaterial whether that provision be regarded as an option to renew the lease, or extend the terms, or to continue the lease in force, or defer completion of a well or to extend the time for performance of the condition to complete a well. The payment of the rentals specified on or before August 23, 1916, was a condition precedent to such renewal extension, or continuance of the lease, or deferring completion, or extension of the time to perform the condition to complete a well. When the option was not exercised, the lease, according to its express terms, terminated on August 23, 1916, because no well was completed on or before that date. The lessee did not agree to pay said sum, and this cannot be called a case of forfeiture incurred for breach of a covenant to pay money, or any other covenant. Up to the 23rd of August, 1916, the lease was unilateral to this extent: the lessee could pay or not pay the rentals, and, if he did not pay, he would not be liable to the lessor for the same. When the lessee failed to exercise the option to extend the time, the situation became the same as though no provision for extending the time had been incorporated in the lease. The defendant failing to exercise its option or privilege, its rights are governed solely by the clause providing that the lease should remain in force for a term of five years from date, and if no well was completed on said land on or before the 23rd of August, 1916, the lease would terminate as to both parties. It has been held by a long line of decisions of this court that an 'unless' lease, such as is here involved, is a unilateral option."

A lease similar to the one here involved was under consideration by the court in the case of Frank Oil Co. v. Belleview Gas & Oil Co., 29 Okla. 719, 119 P. 260, in which the court says:

"This contract is an option to explore for gas and oil. The rule is settled by this court that when contracts are optional in respect to one party, they are strictly construed in favor of the party that is bound and against the party that is not bound."

In the case of Jones v. Moncrief-Cook Co., 25 Okla. 856, 108 P. 403, cited with approval in the above case, the court said:

"Courts will view any delay with great strictness where the party seeking to enforce the performance of a contract was not bound, the other party thereto being bound."

In the case of Cohn v. Clark, 48 Okla. 500, 150 P. 467, the court held that parties may so word their contract that a failure to commence operations within the time specified, or to pay the rents, will, ipso facto, render the lease null and void, and automatically relieve the lessee of liability,—citing the case of Deming Inv. Co. v. Lanham, 36 Okla. 773, 130 P. 260.

The same theory is followed in the later decision of this court in McKee v. Grimm, 57 Okla. 680, 157 P. 308, which cites with approval the holding of the court in Cohn v. Clark, supra.

In Crowder v. James, 110 Okla. 214, 236 P. 891, the first paragraph of the syllabus reads as follows:

"An oil and gas mining lease providing that in case operations for oil or gas are not commenced on the premises within one year from the date thereof, all right and obligation thereunder shall cease and terminate, unless certain rentals be paid within the year to continue the grant in force, is automatically terminated at the end of such year for failure either to commence such operations or to pay such rentals."

To like effect is the case of Harris v. Kerns, 144 Okla. 225, 291 P. 100, wherein the rentals were tendered, as in this case, the next day after they became due:

"Where an oil and gas lease expressly provides that the rights of parties shall terminate if no well be drilled within a fixed period, unless the lessee on or before that date shall pay or tender to the lessor a fixed sum, time is the essence of such contract, and such lease is automatically terminated at the end of such period for failure either to commence such operations or to pay such rentals."

In Curtis v. Harris, 76 Okla. 226, 184 P. 574, this court said:

"Under the express and unequivocal terms of the lease, the rights of both parties were to terminate January 8, 1917, if a well was not completed unless the lessee elected to avail himself of the option to delay the completion of such well by paying the stipulated rental in advance. The lessee was not bound to pay the rental, but payment was a condition precedent to his right to defer drilling. The rule contended for, which seeks to prevent forfeiture, has no application. The lease terminated by its terms on the 8th day of January, no well having been drilled, no payment tendered, and no facts appearing that amount to a sufficient legal excuse to relieve the lessee from the effect of neither completing a well nor paying the stipulated rental."

Applying the above decisions and rulings of this court, as well as others, constituting almost an unbroken line, we are constrained to hold that the statutory relief afforded against forfeiture has no application. The lease terminated automatically by its terms on September 11, 1929, no well having been drilled or payment of rental, unless other facts appear that amount to a sufficient legal excuse to relieve the lessee from the effect of neither completing a well nor paying the stipulated rental in time, which we will now take up for consideration.

The rental was due and payable to lessor or to be deposited in the Oklahoma State Bank on September 11th. It was not paid or tendered until September 12th, and not until after the defendant Ware had instructed the bank that he elected to consider the lease terminated or forfeited and directed the bank not to receive the rentals. The excuse for such failure to pay the rentals is that someone in the bank told her agent, Mrs. Betty Gish, on or about August 12, 1929, that the rentals had been paid.

Mrs. Williams, plaintiff, testified that, contemplating leaving, and sometime in May, she constituted Mrs. Gish her general agent to look after all her business matters, particularly calling the lease to her attention that payment of rental be made when due, because she would not be back by that time. Mrs. Gish confirms her testimony in that Mrs. Williams wanted her to look after her matters in general while gone, but that the lease itself was not mentioned. On pages 51, 52, 53 Mrs. Gish further testifies:

"Q. When did you go to the hospital to have the operation performed? Objection —overruled—exception. A. First of August. Q. When was your first day back in the office? A. 12th of August. Q. How long were you in the office at that time? A. Just a few minutes. Q. When did you come back after that? A. The 13th of August. Q. What did you do? A. I came back down to see about certain things I had to take care of; when I came in this was called to my attention. Q. By whom? A. Mrs. Myers. She said, 'Do you want to take care of this, or do you want us to take care of it?' Q. Of what? A. This lease, I had a notation on our memorandum book. Q. She asked you if you wanted to take care of it, or if you

wanted them to? A. I said I would take care of it. I went to the safe and got the papers, got the description of the property and called the Capitol Hill Bank, a girl answered the phone, I asked her who handled the oil and gas rentals or leases, they gave me the man and I gave him a description of the property, he read it back to me. Q. Did you tell the name of the parties? A. Yes. I had the lease before me, I asked if that rental had been paid, I waited for quite awhile, he came back and said, 'Yes, it has been paid.' Q. You state he told you the rental had been paid? A. Yes, sir. Q. How did you come to ask him if the rental had been paid? A. Because it was called to my attention from this memorandum book. Q. Had Mrs. Williams told you it hadn't been paid? A. No, sir. I was looking after it to be sure it was taken care of. Q. Did you know whether it had been paid? A. No, sir. Q. You called up to see if this had been paid? A. Yes, sir. Q. After that conversation with the bank, did you have any conversation with Mrs. Myers? A. Yes, I told her I had taken care of it. Q. When did you finally come back to work? A. First of September. Q. After that, did you have occasion to look into this lease? A. Yes, sir. Q. What brought the matter to your attention? A. I went to a safe we have, a man called me and asked for prices. Q. What date was that? A. 12th of September, he called me and asked me if Mrs. Williams would sell some royalties. (Objection—overruled—exception) (continuing) I went to the safe and got the papers out to get the description of the royalties, I got the lease out, I thought I better check that rental again, and called the bank again, I asked for the party that handled oil and gas rentals, a man answered me that time and said it had not been paid. Q. What did you do then? A. I got in a car and went to the bank with a check for $20 to pay the rental and tendered it to them, they wouldn't accept it. Q. What reason did they give for refusing? A. They said the time had expired. They told me he was in there all day on the 11th expecting that to come in the day before."

Plaintiff insists that it being her intention to make payment of the delay rental, but the same was not paid because of the information which Mrs. Gish claimed was given her by the depository bank, then such a mistake was a mistake of fact either caused by the depository or by the lessor, and was not caused by neglect of a legal duty on the part of Mrs. Williams, through her agent.

This might be true if the testimony of Mrs. Gish was conclusive in the matter or supported by a fair preponderance of the evidence, but, contradictory to her testimony, first appears the evidence of Earl Buttrell, cashier of the bank, in part as follows (page 72 C.-M.):

"Q. I ask you to state if in your duties as cashier you look after payments of rentals on leases when your bank is the depository in the lease? A. Yes, sir. Q. Does any other officer of your bank have anything to do with that? A. No other officer handles it unless I am not there. If he does, he lays it on my desk. Q. Do you recall ever having been called over the telephone by anyone concerning this lease involved in this case? A. Not until September 12th. Q. Who called you and what was said? A. Mrs. Gish called me. First part of the conversation was that she wanted to know, well, as I recall, she wanted to know if the rentals had been paid to Mr. Ware, stated it was due September 21st. I told her at that time it was due September 11th, that it was already past due. Q. Were you ever called by Mrs. Gish or anyone else concerning the payment of these rentals before September 12th? A. No, sir. I was not."

Again, C.-M. page 79, the witness continuing:

"Q. You heard Mrs. Gish's testimony, did you? A. Yes, sir. Q. I believe her testimony was to the effect that she called someone and asked for the one who had charge of the oil and gas rentals? A. Yes, sir. Q. Who is that somebody in your bank? A. That is me. Q. Do you say that on the 13th day of August, 1929, you did or did not have such conversation as she related on the witness stand with her? A. I did not have such conversation. Q. If you were absent when such call came in, who would be called as having charge of the oil and gas rentals? A. Mr. Shafner, the vice president. Q. Would anybody else besides the vice president? A. Perhaps, Johnson, assistant cashier. Q. Johnson, Shafner, or yourself? A. Yes, sir. Q. Anybody else that would handle it? A. No, sir, nobody else would know anything about it at all."

Next witness called, Mr. J. W. Shafner, vice president, testified as follows (C.-M. 86):

"Q. What official position, if any, do you hold with the Capital State Bank? A. Vice president. Q. Who had charge of the payment on oil rentals on leases in that bank? A. Mr. Buttrell looks after that more particularly, the cashier. I look after them in his absence occasionally—Q. I ask you to state if anyone ever called you during the month of August or September, 1929, with reference to whether or not the rentals had been paid on this lease? A. They did not. Q. When did you first know that the rentals had not been paid? A. First I knew of it, Ware came in and made some inquiry about it subsequent to the rental payment period. Following that some young lady came in and made inquiry and stated to me that she had personally called the bank and somebody told her that the rentals had been paid. Q. Did she state the date she called there? A.

She made two different statements, the first time she came over she claimed she called sometime previous to the rental paying period, then later she made another trip over there and made a tender of money; at that time she made a statement which referred to an entirely different date."

Next witness called by defendants, Lester Johnson (C.-M. page 94), who testified in part as follows:

"Q. Do you recall, Mr. Johnson, ever having been called over the telephone by anyone concerning the payments of rentals on the lease involved in this case, during the month of August, 1929? A. No, sir. Q. Were you ever called by anyone concerning this lease? A. This particular lease I don't recall having been called about. (C.-M. 95) Q. You don't keep the records, you do occasionally look things up? A. Yes, sir. Ordinarily when things come in over the telephone, calls covering oil rentals, I refer them to Mr. Buttrell, if he is not in, to Mr. Shafner. Q. There are cases that you look up yourself? A. Yes, sir. Q. When? A. When I am there by myself it has occurred a few times. Very seldom. (C.-M. 97) Q. Do you ever delegate the looking up of any of this information to any of the clerks? A. No, sir. Q. Always either you or Shafner or Buttrell look these matters up? A. Yes, sir."

From the foregoing it will be seen that the evidence of Mrs. Gish that she called the bank August 13th in reference to the rentals, is rebutted and makes it so conflicting that even the trial court stated what information she received, if any, from the bank could not be determined.

Only where the judgment of the court appears against the clear weight of the evidence in equity cases will the same be reversed. We have examined the record closely, and hold that the findings of the court are not against the clear weight of the evidence.

We find no error in the judgment of the trial court, and the same is affirmed.

The Supreme Court acknowledges the aid of District Judge Enloe V. Vernor, who assisted in the preparation of this opinion. The District Judge's analysis of law and facts was assigned to a Justice of this court for examination and report. Thereafter the opinion, as modified, was adopted by the court.