STATEX PETROLEUM, a corporation; Cosden Petroleum Corporation, a corporation; Caldarko Gas Company, a limited partnership; and Joseph C. Kimble, sole General Partner in said Caldarko Gas Company, a limited partnership, Appellants,

v.

PETROLEUM, INC., a corporation; Leota L. Alkire, Zella M. Boyle, Charles Boyle, H. B. Fink, Ruth G. Fink, James S. Garvey, Olive W. Garvey, Shirley F. Garvey, Willard W. Garvey and Olivia G. Lincoln, Appellees.

No. 6888.

United States Court of Appeals
Tenth Circuit.

Sept. 12, 1962.

Rehearing Denied Oct. 12, 1962.

Wallace E. Robertson, Oklahoma City, Okl. (Robinson, Robertson & Barnes, Oklahoma City, Okl., were with him on the brief), for appellants.

William J. Holloway, Jr., Oklahoma City, Okl. (Crowe, Boxley, Dunlevy, Thweatt, Swinford & Johnson, Vivian Diffendaffer, Oklahoma City, Okl., and R. D. Randall, Wichita, Kan., were with him on the brief), for appellees.

Before PICKETT, HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

This is a diversity action to quiet title to an oil and gas leasehold estate on a tract of land located in Beaver County, Oklahoma, and referred to as the Alkire tract. The appeal is from the order and judgment of the court below quieting ap-

pellees' title to such oil and gas leasehold estate and perpetually enjoining appellants from asserting or claiming any right, title or interest therein.

The material and undisputed facts, as disclosed by the record, are as follows:

On November 29, 1954, the owners (Defendants-appellees Leota L. Alkire, Zella M. Boyle and Charles Boyle) of the tract of land in question executed and delivered to The Pure Oil Company (hereafter referred to as Pure Oil) an oil and gas lease on such tract for a primary term of five years from the date thereof. The habendum clause provided as follows:

"It is agreed that this lease shall remain in full force for a term of five years from this date, and as long thereafter as oil or gas, or either of them is produced from said land by the lessee, or the premises are being developed or operated."

The lease further expressly provided that either party thereto could transfer his or its interest therein.

The tract contains 154.48 acres and is located within an area subject to orders of the Oklahoma Corporation Commission establishing 640 acre drilling and spacing units for the production of natural gas from a common source of supply which in this particular area is the Morrow Sand formation. This tract was unitized with the remainder of the section in which it is located for the production of natural gas from the Morrow Sand.

In June, 1959, Pure Oil entered into a farmout agreement with the appellant, Statex Petroleum (hereafter referred to as Statex), under the terms of which Statex was entitled to an assignment of the November 29, 1954, lease on the Alkire tract upon the drilling of a Morrow Sand gas well in the unit. Thereafter, Statex entered into an operating agreement with Cabot Carbon Company (hereafter referred to as Cabot), the owner of the oil and gas leases on the remaining acreage in the section unit, under which Cabot became the "Oper-ator" of such unit. On that same date, a test well for oil and gas was commenced on land in the section unit other than the Alkire Tract and was completed on July 22, 1959. The completed well, referred to as the "Barby well," was capable of producing natural gas in commercial quantities from the Morrow Sand formation. Upon its completion, the well was shut in and remained shut in until it was connected and commenced delivery of gas to the pipeline of Panhandle Eastern Pipeline Company on May 23, 1960.

After the well was completed, Pure Oil proceeded to assign the November 29, 1954, lease to Statex and it, in turn, assigned certain undivided interests therein to the appellants, Cosden Petroleum Corporation and Caldarko Gas Company, a limited partnership.

The Barby well produced a total of 30,418 m. c. f. of gas from May, 1960, to September, 1960, with production generally decreasing throughout that period of time as a result of water intrusion which developed and came from the pay zone in the Morrow Sand. The Barby well ceased to produce on September 15, 1960. Work-over or remedial operations on the well were commenced on September 19, 1960, which were unsuccessful and production was not restored. On October 24, 1960, all such operations ceased. Cabot's work-over report showed the following notation as having been made on October 24, 1960: "Shut down. Released pulling unit @ 4:00 p. m." According to the expert testimony, with the release of the pulling unit the work-over was completed, the operation was concluded and "that is the normal final entry into the well completion record, 'released tools.'"

During the week following October 24, several meetings were had in which representatives of appellants and Cabot discussed the possibilities of "whipstocking" or a "major fracking operation" in the Barby well in an effort to restore production but determined that no further operations should be attempted on the well. By about November 2, 1960,

appellants and Cabot had decided that a new well should be drilled in the approximate center of the section unit and that the owners of the leases involved should not undertake the expense of drilling such well but a farmout arrangement should be attempted.

However, about this same time Cabot's attorneys pointed out to Statex that the November 29, 1954, lease did not have a clause permitting the resumption of drilling operations for a new well within 60 days after loss of production in the Barby well and discussed with Statex's representatives the necessity of obtaining an extension or ratification of such lease before making arrangements for the drilling of a new well. Cabot's leases did contain such a 60-day clause and it was necessary for the new well to be commenced by November 15, 1960, to come within this 60-day period.

On November 7, 1960, Dawson, a land man for Statex, telephoned to an agent of the owners of the Alkire tract concerning a ratification of the lease in connection with the drilling of the new well. On November 8, he wrote a letter to the agent enclosing a "ratification of and amendment to the oil and gas lease," and requested that such instrument be executed by the owners and returned to Statex.

On November 11, 1960, Dawson wrote a memorandum to the other appellants referring to a "tentative farmout agreement" with Crest Exploration Company and stated:

"Inasmuch as our Alkire lease covering the west half of the west half of said Section contained no provision for the drilling of a new well subsequent to the expiration of the primary term of the lease, and since Crest proposes to drill a completely new well, our farmout arrangements with them may be contingent upon our ability to secure a lease ratification from the Alkires. Crest is presently exploring the rights of the lessee to drill such well in Oklahoma under these circumstances."

On the same date, Cabot wrote to appellants requesting a release of the farmout agreement on the Barby well which was executed on November 14, 1960.

On November 11, 1960, and without replying to Dawson's letter requesting the ratification, the owners of the Alkire tract executed and delivered an oil and gas lease on such tract to appellee, Petroleum, Inc., (hereafter referred to as Petroleum). Thereafter, Petroleum assigned certain undivided interests in this lease to the other appellees. (Defendants, H. B. Fink, Ruth G. Fink, James S. Garvey, Olive W. Garvey, Willard W. Garvey, and Olivia G. Lincoln).

Statex learned of the execution of the lease to Petroleum on or about November 12, 1960, and did not thereafter contact Petroleum concerning the lease or assert any rights contrary to such lease until this action was commenced on March 10, 1961.

In the meantime, and on November 14, 1960, Petroleum joined in the drilling of a new well under its lease at approximately the same location previously considered by Statex and Cabot. This well, known as the "Eisner well," was completed on December 21, 1960, and production in commercial quantities achieved from the same Morrow Sand formation.

Upon these facts, the trial court found against appellants on all controverted issues and concluded the November 29, 1954, lease to Pure Oil had been construed and interpreted by the parties thereto as not entitling appellants to commence additional drilling operations on the section unit after abandonment of the Barby well, and that:

"Under all the circumstances including the terms of the November 29, 1954, lease, the construction placed thereon by the parties and the abandonment of the Barby Well after permanent loss of its production, plaintiffs are entitled to assert no rights under said lease which expired prior to the execution of the lease dated November 11, 1960, to defendant Petroleum, Inc."

In accordance with these conclusions, the lower court entered judgment for the appellees, defendants below, dismissing the complaint and quieting their title and this appeal was perfected.

Appellants concede the above quoted conclusion of the trial court, if correct, is fatal to their claims under their lease. However, they contend that such conclusion is incorrect, that they had a legal right to participate in a second well on the section unit after abandonment of the Barby well, provided they proceeded with diligence and without unreasonable delay, that they were proceeding without unreasonable delay and with due diligence, that this legal right was not lost or abandoned by reason of any conduct on their part and, therefore, the lower court erred in entering judgment against them. Appellants' contention is based upon a construction of that portion of the habendum clause of their lease which provides "or the premises are being developed or operated" which they interpret as permitting the commencement of a second well even after expiration of the primary term of the lease, provided such second well is commenced without unreasonable delay and with due diligence.

It is clear the November 29, 1954, lease by its express terms was extended beyond the primary term of five years or November 29, 1959, by virtue of production of gas having been obtained from the Barby well. The plain intent of the first provision in the habendum clause, i. e., "and as long thereafter as oil or gas, or either of them is produced from said land by the lessee," is that the lease should continue as long as oil or gas, or either of them, was being produced from such well in paying quantities. It is equally clear to the Court, however, that insofar as this provision is concerned the lease was at an end upon the permanent cessation of production from the Barby well and completion of workover operations on October 24, 1960. Townsend v. Creekmore-Rooney Company, Okl., 332 P.2d 35; Brown v. Shafer, Okl., 325 P.2d 743; Anthis v. Sullivan

Oil & Gas Co., 83 Okl. 86, 203 P. 187; Continental Oil Co. v. Osage Oil & Refining Co., 10 Cir., 69 F.2d 19. Cf. Smith v. United States, 10 Cir., 113 F.2d 191, 193. This leaves the narrow question of whether appellants, as they contend, were entitled to commence a new well after the expiration of the primary term of the lease by virtue of the second provision in the habendum clause extending the lease as long thereafter as "the premises are being developed or operated."

The more commonly employed clause in oil and gas leases does not contain this second provision. It is in addition to the language of the first provision. Under Oklahoma law, a lease containing both provisions may be extended beyond the primary term thereof for as long as either of the two provisions is met, that is, for as long thereafter as (1) oil or gas, or either of them, is produced, or (2) the premises are being developed or operated. Prowant v. Sealy, 77 Okl. 244, 187 P. 235.

The lease involved in the Prowant case was for the primary term of three years and the habendum clause contained both provisions. In interpreting the second provision, the court stated (187 P. at page 240):

"It necessarily follows that we must give the words the only other interpretation and construction practicable and of which they are reasonably susceptible, namely, that such words were used in the sense of 'being developed or being operated'; or, in other words, they were intended to mean that, if drilling operations were commenced on the premises within the three years for the purpose of discovering oil or gas and were still being prosecuted in good faith at the expiration of the three-year period, the term was thereby enlarged or extended during the continuance of such drilling operations, or, in the case of the discovery of oil or gas, as long as the same was run. This construction, it seems to us, is the only one that

will give any effect to the language used. It is fair and reasonable, and is consistent with the whole agreement, particularly with that related part thereof wherein provision is made for the commencement of a well within one year or the payment of rentals for delay in the commencement thereof."

In Moore Oil v. Snakard, 150 F.Supp. 250 (W.D.Okl.), the court in construing a similar clause relied upon the Prowant case and stated at page 255:

"The Supreme Court of Oklahoma determined that the words ' " premises developed or operated" ', contained in the habendum clause meant that the lease would be extended so long as the premises were being developed or operated. Thus, continuous operations or development, carried on in good faith and with reasonable diligence, at a well commenced during the primary term would serve to extend the lease, even though there had been no production during the primary term. The leases before this Court are of the same effect."

In 2 Summers, Oil and Gas (Perm. Ed.), § 300.1, at page 252, the following language is found:

" * * * These clauses have been construed as meaning that if a lessee commences a well within the primary term of a lease and carries on the drilling operations diligently and in good faith, although he does not actually complete the well and secure production until after the end of the primary term, the lease remains in force until he completes the well, and if he secures production therefrom, as long as production in paying quantities continues. * * * "

■ Implicit, if not explicit, in the foregoing authorities is the proposition that in order to extend an oil and gas lease beyond the primary term thereof by reason of compliance with "the premises are being developed or operated" provision, the lessee must commence drilling operations on the well within the primary term of the lease. Since appellant's proposed second well was not commenced within the primary term of the lease here in dispute or prior to the time operation of the Barby well had ceased, appellants did not comply with the development or operation provision and the lease expired in accordance with its terms.

Furthermore, even if appellants were entitled to commence drilling operations on a proposed second well as they contend, such operations must be carried on continuously and diligently. A cessation of the drilling operations results in expiration of the lease. As stated in Moore Oil v. Snakard, supra at page 258 of 150 F.Supp.:

"Continuous and diligent operations by the defendant after July 1, 1955 [the expiration date of the leases in question] were a condition limiting the extension of the disputed leases. Such operations ceased on December 2, 1955, and while operations were again undertaken by defendant on February 15, 1956, they were commenced after the leases in issue had expired: * * *.

* * * * * *

"Upon the failure of the condition extending the defendant's four disputed leases, such leases expired in accordance with their terms. The date of expiration being December 2, 1955, when operations on the leasehold ceased. Anthis v. Sullivan Oil & Gas Co., 83 Okl. 86, 203 P. 187; Williams v. Ware, 167 Okl. 626, 31 P.2d 567; Frank Oil Co. v. Belleview Gas & Oil Co., 29 Okl. 719, 119 P. 260, 43 L.R.A.,N.S., 487; Summers, Oil and Gas (Perm.Ed.), Vol. 2, Sec. 305. * * * "

■ So here, continuous and diligent operations by the appellants after production ceased from the Barby well, were a condition limiting the extension of the lease. The operations on the Barby well ceased on October 24, 1960, and no drilling operations on the proposed second well were ever commenced by them. But, appellants argue, the word "continuous"

should not be construed as meaning "without break or interruption of any kind, however brief or unavoidable" and should take cognizance of temporary interruptions due to mechanical failures, inclement weather, and other unavoidable delays of a similar nature and that, in any event, further effort on their part was rendered futile by the execution and delivery of the lease to Petroleum on November 11, 1960, and its commencement of a second well on November 14. A complete answer to this argument is that the record does not disclose any of these factors such as inclement weather to be present in this case and no operations were conducted on the premises from October 24, to November 11. The other factors urged by appellants to excuse the delay in commencing a second well are insufficient to be considered compliance with the continuous and diligent operations requirement.

We conclude that appellants' lease expired with the abandonment of the Barby well on October 24, 1960, and they were not entitled to commence a second well on the section unit. This conclusion finds additional support in the well established rule in Oklahoma that the practical construction of the lease by the parties thereto is entitled to great weight. Earp v. Mid-Continent Petroleum Corporation, 167 Okl. 86, 27 P.2d 855, 91 A.L.R. 188; Prowant v. Sealy, 77 Okl. 244, 187 P. 235, 241. In this connection, the lower court found, undoubtedly on the basis of the letters written by Dawson to the other appellants and to the land owners' agent and the efforts to secure a ratification of the lease as well as other circumstances in the case, that the parties to the lease construed it as not continuing in effect so as to allow commencement of a second well after the Barby well was abandoned. There is substantial evidence in the record to support this and the other material findings and we cannot say they are clearly erroneous.

Affirmed.