**CHEVRON OIL COMPANY, formerly California Oil Company, a California corporation, Appellant,**

v.

**Fred L. BARLOW, Helen M. Barlow, and the Anschutz Corporation, Inc., a Kansas corporation, Appellees.**

No. 10147.

United States Court of Appeals
Tenth Circuit.

Feb. 6, 1969.

Rehearing Denied March 17, 1969.

---

7. 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 77 (1963).

8. Id. at 318, 83 S.Ct. at 760.

9. 401 F.2d 200 (10th Cir. 1968).

10. Id. at 201.

688

Patrick M. Westfeldt, of Holland & Hart, Denver, Colo., (James A. Tilker, of Kline & Tilker, Cheyenne, Wyo., and William E. Barton, of Brown, Drew, Apostolos, Barton & Massey, Casper, Wyo., on the brief), for appellant.

Robert Martin, of Martin, Porter, Pringle, Schell & Fair, Wichita, Kan., (Thomas M. Burns, of Burns & Wall, Denver, Colo., on the brief), for appellee, The Anschutz Corp., Inc.

Wade Brorby, of Morgan & Brorby, Gillette, Wyo., on brief for appellees, Fred L. Barlow and Helen M. Barlow.

Before MURRAH, PICKETT and HOLLOWAY, Circuit Judges.

PICKETT, Circuit Judge.

Chevron Oil Company, formerly California Oil Company, holder of an oil and gas lease comprising approximately 2,000 acres on land in Campbell County, Wyoming owned by Fred L. and Helen M. Barlow, instituted this action seeking a determination and declaration that its lease is valid and the subsequent lease to appellee, the Anschutz Corporation, Inc., is invalid, and other relief. From a judgment for the Barlows and their co-defendant, the Anschutz Corporation, Chevron has taken this appeal.

On September 18, 1962 Chevron and the Barlows executed the lease in question on a form provided by Chevron. The form was peculiar to Chevron and not in general commercial use. The lease provided for a primary term of five years and was subject to extension thereafter not only by production, but also by drilling or reworking

operations.[1] In addition, the lease contained the following complementary provision, paragraph 5, upon which the rights of the parties in this dispute depend:

"If at any time or times after the primary term or within three (3) months before expiration of the primary term, all operations and all production hereunder shall cease for any cause, this lease shall not terminate if Lessee shall commence or resume drilling or reworking operations or the production of oil or gas within three (3) months after such cessation." [2]

For the first four years of the lease period Chevron chose to pay delay rentals of $1,632.30 per year in lieu of drilling. During this period Chevron also held a lease on approximately 2,000 acres adjoining property referred to as the Simpson land.

Prior to the last year of the primary term of the Barlow lease, Chevron's development activity in the area had consisted of agreeing to support an independent operator's well offsetting a portion of the Simpson lease with a dry hole contribution of $1.50 per foot and of a farm out agreement of 320 acres with another independent operator who agreed to drill a test well on the Simpson lease for the same contribution in dry hole money. Both of these wells were completed as small producers, the latter in January 1967, and consequently Chevron made no monetary contribution toward the drilling of either well. On July 12, 1967, sixty-seven days before the expiration of the primary period of its lease, Chevron initiated activity on the Barlow land by executing a farm out agreement with the Ozark Corporation. The agreement provided for the drilling

of a well on an 80-acre tract of the Barlow property which was assigned to Ozark. Chevron also agreed to contribute $2.50 per foot in bottom hole money, the total amount of which was not to exceed $23,500.00. Within a month, August 8, 1967, a similar transaction occurred with respect to the Simpson lease. In separate instruments, Ozark entered into contracts with Anschutz Corporation for the drilling of these wells and assigned to Anschutz a fraction of its interest in each lease. Drilling commenced on the Barlow tract on August 15, 1967, and the well was completed as a dry hole on September 8, 1967. Assuming that Chevron's lease would expire with the end of the primary term in ten days, Anschutz immediately negotiated with Barlow in an effort to obtain a lease on his property.

Shortly after completion of the Ozark No. 1 Barlow well as a dry hole, Anschutz commenced drilling on the Simpson acreage according to the terms of its contract with Ozark. All interested parties knew that the proposed Simpson well was not to be started until after the completion of the Barlow well. Chevron officials then instructed their land agent to notify the Barlows that Chevron's position was that under the provisions of paragraph 5, the drilling of the dry hole within three months of the expiration of the primary term extended the lease for three months after the drilling ceased. On September 12, 1967 the agent so informed the Barlows and also inquired about the possibility of obtaining an extension of the lease. Barlow replied that he would consider an extension if a sizeable bonus offer was forthcoming. On September 18 the Barlows again met with Chevron's land man and advised him that they had been offered $6,000

---

1. Paragraph 2 of the lease provides:
   "Subject to the other provisions herein contained, this lease shall remain in force for a period of five (5) years from the date hereof, called 'primary term,' and thereafter so long as oil or gas is produced from said land hereunder, or Lessee is engaged in drilling or reworking operations on said land hereunder."

2. In the 20 years that this form had been in use, Chevron had never had occasion to take the position against a lessor which it now does with respect to the meaning of paragraph 5, and the provision has never before been tested in litigation.

for a lease. The representative reiterated Chevron's position and made no offer. Barlow termed paragraph 5 a "shyster clause", and generally made it clear that he didn't agree with Chevron's interpretation. Chevron's representative testified that he may have admitted to the Barlows that they "might be right" in their contention that the lease expired at the end of the primary term. The testimony of Chevron officials, together with inter-office communications, discloses that they were aware that their interpretation of paragraph 5 was not free from doubt and that they were willing to risk the possibility of losing the lease rather than invest additional money in an area which at the time did not appear to be promising.[3] Later, Chevron advised Barlow that the company planned to move onto his property without his consent and resume drilling. Barlow replied that if such action were taken, "he would consider it a free well to him."

The Simpson test well blew out under great pressure on October 8, indicating the presence of significant quantities of oil and gas. Anschutz concluded its negotiations with Barlow the following day, and on October 10 Chevron made a sizeable offer of $10 per acre for an extension beyond December 8, the last day, according to its interpretation, that its lease would be in effect under the paragraph 5 extension. Barlow refused the offer and subsequently informed Chev-

---

3. An inter-office communication of September 13, 1967 signed by O. L. Smith, Chevron's district land man, is as follows:

"Pursuant to the terms of M–2342 The Ozark Corporation drilled the Ozark #1 Barlow in the NE¼SE¼ of Section 18, T50N, R73W to 9,451 feet total depth, adequately testing the Muddy objective. It was plugged and abandoned on September 8, 1967. The subject lease, on which this well was drilled has a primary term ending September 18, 1967. The lease (Commercial CW–503) contains a remedial provision which states:

"5. If at any time or times after the primary term or within three (3) months before expiration of the primary term all operations and all production hereunder shall cease for any cause, this lease shall not terminate if Lessee shall commence or resume drilling or reworking operations or the production of oil or gas within three (3) months after such cessation.

"Adopting the most favorable and literal interpretation of this clause the lease is extended to at least December 8, 1967, during which time we or parties in privity with us could 'commence or resume drilling or reworking operations * * *' to obtain additional time under the indefinite term of the lease.

"There is some risk in this interpretation in that this precise provision to our knowledge has not been tested in the courts of Wyoming, or other producing states.

"It is recommended that we assume the risk of reliance upon the above in-terpretation of subject lease for the purpose of allowing us at least enough additional time to see the results of the Ozark #1 Simpson well, scheduled for commencement September 15, 1967 in the SW¼SE¼ Section 6, T50N, R73W (M–2343). If this well should have good Muddy sand development we could at that time determine the most expedient method for further extension of the Barlow lease.

"Other alternatives have been considered. We could approach the lessor for a short term extension of the lease for minimal consideration, or a new lease for sizeable consideration. We believe he would not accept the first situation and the second does not fit in with our exploratory plans for this area.

"Anschutz has shown recent interest in this area for Muddy and Minnelusa objectives and has been in contact with D. L. Cook, a Denver broker, for acquisition or contribution towards a possible Muddy test on or offsetting the western extremity of the Barlow lease. We believe Anschutz has made contact with our lessor as to a lease after the expiration of the primary term of our lease. However, as of today he is not signing because of his awareness of our interpretation of the remedial provision.

"In view of the short additional time required for our present purposes and the apparent unlikelihood of our being forced to defend our interpretation, the risk of a possible expiration of this lease on September 18, 1967 should be assumed as a normal business practice."

ron that he had given Anschutz a lease. After learning of this, Chevron again attempted to negotiate a lease with Barlow and again stated that in the alternative it intended to move in and resume drilling on his property.

Chevron instituted this action on October 30, 1967 and without consent of either Barlow or Anschutz, entered the Barlow property and commenced drilling on November 16. A dry hole was completed on December 10, 1967, and it is now contended that another 90-day period began to run from that date. On February 21, 1968 a third well was started and completed as a producer on March 15, 1968.

The parties stipulated that none of the events which would preserve the lease under paragraph 2 were in progress at the end of the primary term. The decisive issue, then, is whether under the provisions of paragraph 5 the completion of the Ozark No. 1 Barlow well as a dry hole on September 8, 1967 extended the lease an additional three months from that date. Chevron contends that it did and that the resumption of drilling operations within that three months and further drilling within a subsequent three-month period continued the lease in force.

The trial court construed the clause "all operations and all production shall cease for any cause" of paragraph 5 to mean that both operations and production must have occurred and ceased as a condition precedent to the extension of the lease. Moreover, the trial court reasoned that production had not taken place during the primary term and consequently could not have ceased. The trial court also concluded that the word "operations" in the pertinent clause refers to operations related to production, rather than the drilling and abandoning of a dry hole. Stated briefly, it was the trial court's view that paragraph 5 was without significance if there had been no production.

Appellees argue that Chevron's construction of the lease results in substituting the disjunctive "either/or" for the conjunctive "and" in the clause "all operations and all production". Chevron replies that "and" was used purposefully to refer to all of the events enumerated in paragraph 2 which would extend the lease; that when the lease is read as a whole, the use of "either/or" in place of "and" would be grammatically incorrect.[4]

The fallacy of Chevron's argument lies in its assumption that if either production or operations ceased, then the other would be occurring and hold the lease under paragraph 2 thereof. Obviously underlying paragraph 5 is the assumption that all activity on the leased tract will cease, not continue. When the potential situations surrounding a cessation are considered, it becomes apparent that in certain of these situations the insertion of "either/or" would make the better grammatical sense. Chevron's position is that paragraph 5 becomes operative when everything then taking place on the leased tract stops, whether it is drilling, reworking operations or production, or all of them. In the situation where all are taking place, and all cease, the clause as written might be the preferable method of stating the conditions. In Texas Co. v. Maloney, 48 Wyo. 280, 44 P.2d 903,

---

4.  Concerning the choice of words, the trial court said:
    "* * * The use of the conjunctive form 'and' in paragraph 5 of the lease cannot be ignored or regarded as accidental, particularly when the word 'or' is used to separate references to the same conditions in other portions of the lease. Therefore, and given its ordinary meaning, the phrase 'all operations and all production' means that both production of oil or gas and opeations must have occurred on the leased premises and ceased within three (3) months preceding the termination of the lease as a condition precedent to the extension of the lease beyond its primary term under paragraph 5."

the Wyoming Supreme Court said: "The conjunction 'and' is a co-ordinate conjunction. It is not explanatory, but signifies and expresses the relation of addition." The disjunctive "or", on the other hand, is used to indicate an alternative, not both. Webster's New International Dictionary (1950—G. & C. Merriam Co.) at 1712. Where, as in this case, the only activity which ever took place was the drilling of a dry hole, it is apparent that only a clause with "either/or" inserted would accurately describe the situation. To construe a simple clause such as "all operations and all production" to cover all three contingencies taxes ordinary English syntax to the point of uncertainty. In any event, we conclude that the provision in controversy is susceptible of more than one meaning, and therefore ambiguous. Socony-Mobil Oil Co. v. Humble Oil and Refining Co., 10 Cir., 387 F.2d 155.

■ In construing an ambiguous instrument, a court may resort to extrinsic evidence such as the conduct of the parties to ascertain the true meaning of the instrument, and if possible, the interpretation given the instrument by the parties. Socony-Mobil Oil Co. v. Humble Oil and Refining Co., supra; El Paso Natural Gas Co. v. Kelly, 10 Cir., 308 F.2d 820; Statex Petroleum v. Petroleum, Inc., 10 Cir., 308 F.2d 815, 96 A.L.R.2d 315; 2 Summers, Oil and Gas, § 374. The record shows no evidence of the interpretation by either side at the time of execution. As to Barlow, the evidence reveals only that following completion of the dry hole, he steadfastly maintained that nothing had taken place which would extend the lease beyond the primary term. With respect to Chevron, it had not in the 20 years use of the lease form asserted that paragraph 5 included the ordinary "dry hole" provision found in many leases, and the inter-office memorandum referred to in F.N. 3 hereof indicates that Chevron officials realized the tenuousness of their position. Chevron made no serious attempt to negotiate an extension or renewal of the lease until after discovery on the Simpson land demonstrated the presence of valuable quantities of oil in the area. When oil was discovered, Chevron tendered a substantial offer. The evidence indicates that Chevron officials, although doubtful of Chevron's rights, concluded that their interpretation of paragraph 5 would give Chevron the opportunity to learn the outcome of the Simpson test well before having to decide whether to abandon the Barlow lease or pay a bonus for an extension or renewal thereof. They based their action on an educated assessment of the risk involved. In view of Chevron's own doubt, it is not now in a position to complain if the terms of its own lease form are construed strictly against it and in favor of the lessor. Goodman v. Kelly, Wyo., 390 P.2d 244; Tauer v. Williams, 69 Wyo. 388, 242 P.2d 518; 2 Summers, supra, § 372.

■ The pertinent cases to which our attention has been directed involved the construction of leases wherein the intention of the parties that the leases would be preserved by the drilling of a dry hole or holes during the primary term was clearly and unequivocally stated. St. Louis Royalty Co. v. Continental Oil Co., 5 Cir., 193 F.2d 778; Stanolind Oil and Gas Co. v. Newman Bros. Drilling Co., 157 Tex. 489, 305 S.W.2d 169. The controversies arose over the application of what are known as the "30 day-60 day" clauses of the leases. The courts were not confronted with the threshold problem of ascertaining whether according to the terms of the lease production during the primary term was a condition precedent to the extension of the lease. In the absence of fraud or mutual mistake the court will not re-write or supply missing terms for the parties and, in effect, substitute a reformed contract for them, thereby including something not present in the original lease. Wickham v. Skelly Oil Co., D.C. Okl., 106 F.Supp. 61, aff'd, 10 Cir., 202 F.2d 442; see, Russell v. Curran, 66 Wyo. 173, 206 P.2d 1159; 76 C.J.S. Ref-

ormation of Instruments § 5. If Chevron had desired to insert a "dry hole" clause,[5] it could readily have done so and avoided the uncertainty and controversy which has resulted from the extremely doubtful provision of the present lease.

■ The trial court's determination of the meaning of paragraph 5 is reasonable and harmonizes it with the remainder of the lease, and with paragraph 2 in particular, and reflects the intention of the parties. Rogers v. Westhome Oil Co., 10 Cir., 291 F.2d 726; Pacific-Wyoming Oil Co. v. Carter Oil Co., 31 Wyo. 314, 226 P. 193. In construing paragraph 5 to require production during the primary term of the lease before it is effective, the trial court gave to the words "or" and "and" the meaning that is generally given when they are used in similar context. Furthermore, this construction does enlarge upon paragraph 2 by allowing a three-month period after cessation of production activities to determine the geologic and economic wisdom of commencing or resuming drilling operations, or developing further production from a well or wells upon which operations have ceased.

Finally, we agree with the trial court's conclusion that the word "operations" in paragraph 5 refers to operations in connection with production rather than operations related to drilling. We are convinced that had the parties, experienced as they were in matters pertaining to oil and gas leases, intended that paragraph 5 should apply to the drilling of dry holes, they would have chosen more expressive words and not relied upon the word "operations" to convey their intent. In solving this semantic riddle we think the trial court's approach was logical and well-conceived.

Affirmed.

5. Beginning at Section 611, page 204 of Williams, Oil and Gas Law, Volume 3, the author treats the subject of various "dry

HOLLOWAY, Circuit Judge (dissenting).

I respectfully dissent. To me the appeal turns on a pure question of law under the Chevron lease. I conclude that it gave Chevron the right to continue the lease in force by the operations it conducted and that Chevron was entitled to judgment.

The rights of the parties are decided by paragraph 5 of the lease. It is undisputed that within three months before expiration of its primary term the Ozark No. 1 Barlow well was completed as a dry hole; that within three months after this, the Chevron No. 1 Barlow well was commenced, being completed as a dry hole; and that, within three months again, the Chevron No. 2 Barlow well was commenced, being completed as a producing well. These steps complied with the conditions of paragraph 5, in my opinion. That paragraph reads as follows:

"If at any time or times after the primary term or within three (3) months before expiration of the primary term, all operations and all production hereunder shall cease for any cause, this lease shall not terminate if lessee shall commence or resume drilling or reworking operations or the production of oil or gas within three (3) months after such cessation."

The majority opinion concludes that for paragraph 5 to come into play, both operations and production had to exist previously which was not the case. The inference is drawn from the reference to cessation of "all operations and all production." The majority opinion further reasons that in any event the provision is ambiguous and to be construed in the light of extrinsic evidence and against Chevron. I agree that there is an uncertainty of meaning in the single phrase "all operations and all production," but cannot concur in the conclu-

hole" provisions appearing in most contemporary lease forms.

**694**

sion of the majority opinion or that the lease as a whole is ambiguous.

The majority interpretation is grounded primarily on an inference from this one isolated phrase and conflicts with plain words immediately following. There, among other things, the right is given the lessee to prevent termination of the lease if the lessee shall commence production within the three months period. An inference that production had to exist previously makes such a right meaningless. Moreover, the term "commence" appears in the phrase "commence or resume." Thus, it appears clear that the term was used deliberately and with recognition of the distinction between circumstances that had previously existed, and those that had not. Such an inference that production had to exist previously for paragraph 5 to operate will not square with the remainder of the instrument, and violates the cardinal rule that the written instrument be so construed, if possible, as to harmonize and give effect to all its provisions. Studebaker Bros. Co. v. Mau, 13 Wyo. 358, 80 P. 151, 153 (1905); Frankfort Oil Company v. Snakard, 279 F.2d 436 (10th Cir. 1960), cert. denied, 364 U.S. 920, 81 S.Ct. 283, 5 L.Ed.2d 259 (1960).

The phrase "all operations and all production" appears to me to be an imperfect shorthand way of describing all the circumstances that would otherwise extend the lease under paragraph 2. In the single phrase there is uncertainty, but to me its ambiguity is resolved by fairly clear terms in the remainder of the lease, so that the instrument is not ambiguous as a whole and resort need not be made to extrinsic evidence. Dipo v. Ringsby Truck Lines, 282 F.2d 126 (10th Cir. 1960). Likewise the conclusion that the term "operations" in paragraph 5 means only operations in connection with actual production seems to me to clash with the recognition in several provisions in the lease of the distinction between activities related to production and other operations. Cf. Statex Petroleum v. Petroleum, Inc., 308

F.2d 815, 819, 96 A.L.R.2d 315 (10th Cir. 1962).

Concluding that Chevron complied with the terms of paragraph 5 by an interpretation that is fairly clear, I would hold that Chevron preserved its rights under the lease and is entitled to judgment.