**KOHLER, STOVER & IVEY**
v.
**CITY OF TULSA et al.**
No. 4788.

United States Court of Appeals,
Tenth Circuit.

July 19, 1954.

Ralph Elliott, Sherman, Tex. (Joe A. Moore, Odessa, Tex., J. S. Freels, Sherman, Tex., Everett S. Collins & Joe A. Moore, Sapulpa, Okl., and Freels, Elliott & Nall, Sherman, Tex., on the brief), for appellant.

R. L. Davidson, Jr. and H. M. Crowe, Jr., Tulsa, Okl., for appellees.

Before PHILLIPS, Chief Judge, and BRATTON and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

Kohler, Stover and Ivey, a partnership,[1] brought this action against the City of Tulsa, Oklahoma,[2] and certain officials of the City, seeking by a declaratory judgment, an interpretation of a "lump sum" construction contract entered into by the City and the Contractor. From an adverse judgment the Contractor has appealed.

The primary question presented is whether, under the contract, the Contractor was entitled to compensation for the excavating, hauling, placing and compacting of borrow material in addition to the "lump sum" contract price.

On December 30, 1952, the Contractor submitted to the City a proposal and bid for the construction of portions of the Turkey Mountain Sewage Treatment Plant near the junction of Mooser Creek and the Arkansas River, in accordance with plans and specifications prepared and adopted by the City and pursuant to

---

1. Hereinafter called the Contractor.

2. Hereinafter called the City.

a written notice to contractors and instructions to bidders issued by the City.

The instructions advised each prospective bidder if he had doubt as to the true meaning of any part of the plans, specifications, or other proposed contract documents he might obtain an interpretation thereof in the form of a written addendum by filing a request therefor with the City Engineer. Prior to submitting its bid, the Contractor did not make a request for such interpretation by the City Engineer of any part of the plans, specifications, or other proposed contract documents.

In its proposal, which became an integral part of the contract, the Contractor stated that it had examined the plans, specifications, general and special conditions, and other contract documents and all addenda thereto, the topography and condition of the sites of the work, and that it was acquainted with and fully understood:

"* * * (a) the extent and character of the work covered by this proposal; (b) the location, arrangement, and specified requirements of and for the proposed new structures, equipment, accessories, piping, and other miscellaneous items of work appurtenant thereto; (c) the nature and extent of the excavations to be made and the type, character, and general condition of the materials to be excavated; (d) the necessary handling and rehandling of excavated materials including the separation and replacement of top soil and the construction of fills and embankments and the consolidation thereof; * * * (f) existing and probable construction difficulties and hazards; (g) local conditions relative to labor, transportation, hauling, * * * and; (h) all other factors and conditions affecting or which may be affected by the specified work."

The Contractor, by its bid, offered: "* * * to furnish all required materials, supplies, equipment, tools and plant; to perform all necessary labor; and to construct, erect, equip, and complete all work stipulated in, required by, and in accordance with, the contract documents hereto attached and the plans and specifications referred to therein (as altered, changed or modified by any and all addenda thereto), for * * * The Sum of $831,672."

The proposed bid was accepted by the City and the contract was entered into on January 27, 1953.

The plans showed the original land contours and final contours of the embankments and clearly and accurately reflected the quantity of fill material required to construct the embankments and the work to be done.

The contract provided that the contractor should "do all excavation work, backfilling, grading and enbankment work indicated on the drawings" or stipulated in the contract and that "this work shall include * * * the handling, storage, transportation and disposal of all excavated material; * * * *any and all borrow necessary to the work* and final grading and dressing of the site to the grades and elevations shown on the drawings or specified to be done." (Italics ours.)

The contract provided that the Contractor should furnish all equipment, material and labor, and, in accordance with the provisions of the contract and in conformity with the contract plans and specifications, execute, construct and complete all work included in and covered by the Contractor's proposal.

Thus, it will be seen that by the explicit terms of the proposal, which became an integral part of the contract, and the provisions of the formal contract, the work to be performed included the excavating, hauling, placing and compacting of borrow material and that the Contractor obligated himself to furnish all equipment, material and labor necessary to do such work at the "lump sum" contract price.

However, the Contractor contends other provisions of the contract require a different interpretation thereof.

The contract contained a provision with respect to unit adjustment prices, the material portion of which read:

"The following unit adjustment prices are subject to approval and acceptance by the City of Tulsa, Oklahoma. * * * such unit prices * * * will be used in determining additions to, or deductions from, the contract amount, when authorized changes in the work, shown on the plans or as specified, are directed, * * *. Unit adjustment prices, which include the furnishing of all materials and the performance of all necessary labor, are submitted as follows:

"a. Excavation Work—per Cubic Yard of Excavation:

"1. Structure Excavation: One Dollar and No Cents      ($1.00)

"2. Trench Excavation: for yard piping. Three Dollars and Eighty-Five Cents      ($3.85)

"3. Effluent Ditch Excavation: Variation from the amount named in the special Conditions. No Dollars and Thirty-Five Cents      ($0.35)

"4. Borrow Excavation: No Dollars and Sixty-Five Cents      ($0.65)

"5. Excavation for Mooser Creek Channel Change: No Dollars and Forty-Six Cents      ($0.46)

" * * * * "

The contract provided that excavation quantities would be measured upon the basis of the volumetric displacement of the excavated materials in their original form and condition prior to their removal; but that borrow pit excavation quantities should be calculated on the volume of compacted material in the fills and embankments.

The contract further provided:

" * * * The unit price per cubic yard paid for borrow shall cover all costs of stripping, selection, hauling, placing and compaction. * * * "

We think it obvious that the provisions of the contract, with respect to unit adjustment prices, the measurement of excavated material, the calculation of borrow pit excavations and what the unit price per cubic yard for borrow should cover, were written into the contract only for the purpose of computing the amounts to be added to the contract price when authorized changes increased the work to be done or the amount to be credited to the City when authorized changes decrease the amount of work to be done.

The contract specified many unit prices. No contention is made that any of them, other than the unit price for borrow excavation, were to be applicable, except in case of authorized changes in the work to be performed. Surely, if the parties had intended that borrow excavation, and it alone, was to be paid for on the basis of the unit price, in addition to the "lump sum" contract price, they would have expressly provided therefor in the contract.

Under settled Oklahoma law, " * * * rules of construction and interpretation are available to remove uncertainty concerning the meaning of a contract when ambiguity exists in the written instrument. * * * "

"However, if the language is clear and explicit, it governs in determining the intent of the parties, in the absence of fraud, accident, mistake or absurdity. * * * "[3]

---

3. Continental Casualty Co. v. Wear, 185 Okl. 245, 91 P.2d 91, 93; Johnson v. Butler, 206 Okl. 632, 245 P.2d 720, 722; Van Zant v. State Insurance Fund, 203 Okl. 421, 223 P.2d 111, 113.

■ We agree with the conclusion of the trial court that the contract was free from ambiguity and that under its provisions borrow material was included in the "lump sum" price and was not to be paid for on a unit price basis, except where changes were made increasing or decreasing the amount of work to be done.

In view of our conclusion that the language of the contract is clear, explicit and free from ambiguity, the facts hereinafter stated are material, if at all, only on the Contractor's asserted claim of estoppel.

■ The Contractor urges that it was impossible to determine the amount of material excavated at the site, which could be used as backfill [4] in constructing the embankment and therefore it was impossible to estimate the amount of borrow material [5] that would have to be excavated, transported, placed and compacted in the embankment.

The contract, with respect to borrow material, in part reads:

"Borrowed Material for Fills. It will be necessary to bring in considerable borrowed material to complete the fill about the new plantsite. In order to provide material that will be suitable for compaction, all borrow shall be excavated in such locations and depths as are determined and directed by the Engineer. The site or sites of such borrow pits will be within a radius of approximately one mile from the new sewage plant. * * *"

The contract required the Contractor, within 30 days after the awarding of the contract, to submit to the City Engineer a detailed cost breakdown estimate covering the work to be done in an aggregate total amount equal to the amount of the "lump sum" price. The cost esti-mate submitted by the Contractor included an amount for backfill, but did not specifically designate any amount for borrow. One of the City Engineers testified that the sole purpose of the cost estimate was to aid them in making periodic estimates of the work completed, to afford a basis for partial payments to the contractor.

After the commencement of the work and on February 4, 1953, the City Engineer directed the Contractor to prepare a suggested plan for the elimination of certain embankment work in a specified area of the project site. The change in the amount of embankment and therefore in the quantity of material which would be required to complete the work, up to the time of trial, had not been made the subject of a formal change order, as provided in the contract. Hence, the fact that no deduction had been allowed the City for reduction of the amount of embankment to be constructed was not material.

The City Engineer first was advised of the contention of the Contractor that borrow material was to be paid for on the basis of a unit price and was not included in the "lump sum" price on April 9, 1953. The City Engineer immediately advised the Contractor that he interpreted the "lump sum" price to include the borrow material and his action thereafter was entirely consistent with that position. The trial court so found and its findings are supported by substantial evidence and are not clearly erroneous.

The contract documents were attached to the notice to contractors. The Contractor knew when it made its bid that a considerable amount of borrow material would be required and that such amount could not be precisely estimated. The Contractor stated in its bid that it was familiar with "existing and probable construction difficulties and hazards."

---

4. Backfill is material excavated at the works site and used to construct a fill or embankment at the works site.

5. Borrow materials are materials excavat-ed at a location outside of the works site, known as a borrow pit, and transported to and used for constructing a fill or embankment at the works site.

Nevertheless, without requesting any interpretation of the contract, the Contractor elected to bid in a lump sum to do all the work, which, by the express provisions of the contract, included the excavation, hauling, placing and compacting of borrow material necessary to conclude the work. Parenthetically, it may be observed that in the cost estimate the Contractor did estimate the amount of backfill. If it was able to do that with reasonable accuracy, the amount of borrow could have been determined by a simple mathematical calculation of the total quantities of material in the embankments and a deduction from the latter of the estimated quantity of backfill.

We conclude, as did the trial court, that the proof was wholly insufficient, as a matter of law, to create an estoppel on the part of the City to deny the Contractor's contention that, under the contract, borrow material was to be paid for on a unit price basis in addition to the "lump sum" price.

Affirmed.