A. Fred DIPO and Ray V. Lilenquist, Appellants,

v.

RINGSBY TRUCK LINES, a corporation, Appellee.

No. 6311.

United States Court of Appeals Tenth Circuit.

July 29, 1960.

---

Richard L. Bird, Jr., Salt Lake City, Utah (Lynn S. Richards, Salt Lake City, Utah, on the brief), for appellants.

Harley W. Gustin, Salt Lake City, Utah (John F. Mueller, Denver, Colo., and William S. Richards, Salt Lake City, Utah, on the brief), for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and BREITENSTEIN, Circuit Judges.

PHILLIPS, Circuit Judge.

In September, 1955, Dipo and Lilenquist entered into separate employment contracts with Ringsby Truck Lines, a corporation.[1] Each of them instituted an action against Ringsby to recover moneys alleged to be due him on the employment contract entered into with him. Ringsby filed a counterclaim in each case, seeking relief predicated on a written contract entered into in August, 1955, for the sale to Ringsby by Dipo, Lilenquist and Axel Nelson of all of the issued and outstanding stock of Inland Freight Lines,[2] Eastern Utah Transportation Company and Uintah Freight Lines, corporations and motor carriers engaged as common carriers in interstate commerce, and of Inland Equipment Company, which was the owner of motor vehicle equipment leased by it to such carriers. The sellers either owned or controlled all of such issued and outstanding stock. Ringsby is also a motor carrier engaged as a common carrier in interstate commerce. The cases were consolidated, a jury trial was waived, and they were tried to the court.

The court found that Dipo was entitled to recover $39,595.50 under his employment contract and that Ringsby was entitled to recover from Dipo on its counterclaim $10,158.39; that Lilenquist was entitled to recover $48,155.30 on his employment contract and that Ringsby was entitled to recover from Lilenquist $10,159.62 on its counterclaim against him. A judgment for the net amounts due Dipo and Lilenquist, respectively, was entered and they have appealed, challenging that part of the judgment which awarded recovery against them on the counterclaims.

The purchase price for the stock stipulated in the sale contract was $1,450,000, to be paid as follows: $75,000 upon the execution of the sale contract, $925,000 on the closing date provided for in the sale contract, $112,500 on the 15th of March next following the closing date and $112,500 on the 15th day of March of each succeeding year thereafter, until the purchase price with interest at five and one-half per cent per annum on the unpaid balance was paid in full. The sale contract contained provisions for the adjustment of the purchase price if certain contingencies should eventuate. The primary issue here is as to the interpretation to be placed upon such adjustment provisions. The pertinent provisions of the sale contract read:

"1. It is understood that the financial statements of Inland Freight

---

1. Hereinafter called Ringsby.

2. Hereinafter called Inland Freight.

Lines, Eastern Utah Transportation Company, Uintah Freight Lines and Inland Equipment Company presented to the Buyer are those of the corporations as of June 30, 1955, which the Sellers represent and warrant are a full, true and correct statement of the financial condition of the corporation as of that date, and the parties agree to accept said balance sheets as the basis of this transaction subject to the verification of said financial statements by the Certified Public Accounting firm of Newman, Pardoe & Diamond, which certification shall be at the expense of the Sellers. The certification shall be as to a reconciliation of the cash accounts; a certificate as to the condition of the books and records of the corporation reflecting the genuineness of the accounts as shown upon the balance sheets; the cost of the tangible property and reserve for depreciation set up against the same and a verification of the liabilities of the corporations as being truly reflected on said balance sheets. In the event the audit so certified shall show a verification of the financial statements so warranted in the aggregate net amounts or within $10,000.00 thereof, the representations and warranties shall be accepted by the parties as accurate and correct, and there shall be no adjustment of purchase price on that account. In the event there is any aggregate net difference in excess of the amount specified, the purchase price shall be adjusted accordingly.

\* \* \* \* \* \*

"8. The Sellers agree to protect the Buyer against any losses arising from tax liabilities not shown on said balance sheets on and prior to the execution of this agreement which reduce the net worth of Inland Freight Lines, Eastern Utah Transportation Company, Uintah Freight Lines or Inland Equipment Company. It is understood and agreed that the Sellers shall submit to the Buyer monthly balance sheets and operating statements of each corporation and will file reports and tax returns in accordance with the directions of the auditors, Newman, Pardoe and Diamond, and will submit to the Buyer quarterly certified statements from the auditors that said reports and tax returns have been so filed. All undisclosed assets shall be credited to the Sellers to the extent needed to offset undisclosed liabilities or deficiencies in assets. Any deficiencies over and above undisclosed assets shall be charged to the Sellers, subject to the adjustment figure of $10,000.00 heretofore stipulated."

In order to finally consummate the sale of the stock it was necessary to obtain approval of the sale by the Interstate Commerce Commission.[3] In November, 1955, a hearing was held before the Interstate Commerce Commission on an application for approval of the sale of the stock and it was then represented that the audit provided for in Paragraph 1 of the sale contract had been completed and that the discrepancies in the balance sheets reflected by the audit were less than the stipulated tolerance amount of $10,000. In July, 1956, the Interstate Commerce Commission approved the stock sale. The parties to the contract then fixed July 31, 1956, as the closing date.

An account with Gallagher Freight Lines [4] was reflected on the balance sheet of Inland Freight as an account receivable in the amount of $16,602.65. That account was for charges for trailer rentals, resulting from interchanges, under an arrangement among Inland Freight, Gallagher and Watson Brothers,[5] the latter two also being motor carriers. Watson hauls freight from the East to

---

3. 49 U.S.C.A. § 5(2) (a) (i).

4. Hereinafter called Gallagher.

5. Hereinafter called Watson.

Denver. At Denver, Watson trailers were taken over by Gallagher and hauled to Salt Lake City. At Salt Lake City they were taken over by Inland Freight and hauled to the West Coast. On a haul from the West Coast, like interchanges of trailers were made among those three carriers. For a time after these interchanges began, rent for trailers interchanged was charged on a mileage basis. The trailers of Inland Freight were equipped with hubometers, devices for registering mileage. Trailers of Gallagher and Watson were not so equipped. That mileage was based on estimates. The mileage system proved unsatisfactory and after it had been in operation for a time the three motor carriers agreed to base rentals on a per diem basis. The $16,602.65 account receivable referred to above accrued while the mileage system was in use. Gallagher disputed the account and contended that rentals due it for its trailers were an offset against the claim of Inland Freight. The audit set forth the following statement with respect to such account:

"As to Gallagher Transfer Co., we are advised by letter from Inland Freight Lines' president that the claim is valid. We test-checked a schedule of Trailer Rentals and payments to Gallagher Transfer Co. and determined that the payments on Watson Bros. Trailers were paid to Gallagher. In reply to our request for confirmation Gallagher indicated it had not agreed to the charge against it for these trailer rents and would not pay. Since the item is in dispute, we have elected to leave it on the books until its value is ascertainable, according to Interstate Commerce Commission accounting procedures."

In December, 1955, at a date subsequent to the completion of the audit, but prior to the closing date of the sale, Inland Freight settled the account with Gallagher for $6,291.29.

The trial court found that either the Gallagher claim against Inland Freight was an undisclosed liability against Inland Freight in the amount of $10,311.36, or in the alternative that the Gallagher account receivable reflected on the books of Inland Freight was a non-genuine account receivable in that amount.

When a shipper by motor carrier pays freight charges in excess of the lawful rate, the shipper is entitled to a refund of the unlawful excess from the motor carrier. When the shipper discovers such overcharges it bills the carrier therefor. The trial court found that overcharges were due to shippers from Inland Freight and Uintah Freight at the time of the audit, but that such overcharges were not reflected by the balance sheets and that claims therefor were not asserted until after the audit had been completed and that there were undisclosed liabilities of such corporations in the amount of $30,843.17. It is clear from the record that such overcharges were not reflected by the books of Inland Freight and Uintah Freight Lines and were undisclosed at the time of the audit. Carriers customarily carry on continuing audits for the purpose of discovering undercharges. Ordinarily, the amounts of overcharges and undercharges for freight are substantially equal. Hence, it is not customary to set up a reserve for overcharges.

Undercharges by Inland Freight and Uintah Freight Lines which were in existence prior to the audit, but not disclosed until after the audit had been completed, were estimated to be $4,000. The trial court found that such undercharges in the amount of $4,000 were undisclosed assets at the time of the audit and should be offset against the undisclosed liabilities resulting from overcharges.

At the trial Dipo and Lilenquist made an offer of proof of the negotiations which led up to the making of the written sale contract. The trial court found that the sale contract was not ambiguous and rejected such offer of proof.

Counsel for Dipo and Lilenquist contend that the sale contract is not ambiguous and "plainly provided that after the audit and the acceptance thereof by the parties only tax liabilities would be taken into account to establish a reduction of the amounts payable by the Buyers and that against that would be credited all undisclosed assets to the extent needed to offset the liability." However, they contend that if the sale contract is subject to any other construction it is ambiguous and in that event evidence of the negotiations leading up to the making of the written sale contract should have been admitted.

■ It is a cardinal rule in the construction of contracts that the court must, if possible, ascertain and give effect to the mutual intention of the parties, so far as that may be done without contravention of legal principles, statutes, or public policy.[6]

The intention of the parties to the contract is to be gathered from a consideration of the contract as a whole.[7]

■ In the absence of ambiguity the intention of the parties must be ascertained from the language used in the written contract, without resort to parol evidence or extrinsic circumstances.[8]

■ A contract is ambiguous where, upon the consideration of the contract as a whole, the provisions in controversy are susceptible of more than one meaning.[9]

The applicable rules of construction are well stated by the Supreme Court of Utah in Ephraim Theatre Company v. Hawk, 7 Utah 2d 163, 321 P.2d 221, 223, where the court said:

"In considering the controversy here it is well to keep in mind the fundamental concepts in regard to contracts: that their purpose is to reduce to writing the conditions upon which the minds of the parties have met and to fix their rights and duties in respect thereto. The intent so expressed is to be found, if possible, within the four corners of the instrument itself in accordance with the ordinary accepted meaning of the words used. Unless there is ambiguity or uncertainty in the language so that the meaning is confused, or is susceptible of more than one meaning, there is no justification for interpretation or explanation from extraneous sources. * * * "

In the light of the foregoing applicable rules of construction, we shall proceed to a consideration of the issues here involved.

The effect of the argument by counsel for Dipo and Lilenquist is that it was the intention of the parties that the phrase "undisclosed liabilities or deficiencies in assets" in the next to the last sentence of Paragraph 8 of the sale contract should be limited to undisclosed tax liabilities not shown on the balance sheets on and prior to the execution of the sale contract. We think it plain that Paragraph 8 is not subject to that construction.

It is true that the first sentence of Paragraph 8 makes provision for protection of the buyers, only, from any loss arising from undisclosed tax liabilities and is restricted to such liabilities and that the second sentence of Paragraph 8 relates to the filing of reports and tax returns and the furnishing of information to the buyers. But the phrases "undisclosed assets" and "undisclosed liabilities or deficiencies in assets" are plainly of much broader im-

6. F. W. Woolworth Co. v. Petersen, 10 Cir., 78 F.2d 47, 48.

7. Kelso v. Kelso, 10 Cir., 225 F.2d 918, 919.

8. Nash v. Towne, 5 Wall. 689, 72 U.S. 689, 703, 18 L.Ed. 527; 17 C.J.S. Contracts § 322, p. 750.

9. United Packinghouse Workers v. Maurer-Neuer, Inc., 10 Cir., 272 F.2d 647, 649, certiorari denied 362 U.S. 904, 80 S.Ct. 611, 4 L.Ed.2d 555.

port than mere assets resulting from tax refunds and liabilities resulting from undisclosed tax liabilities.

We think the plain meaning of Paragraph 1 of the sale contract was that the accountants should determine whether the balance sheets correctly reflected the assets and liabilities as shown by the books and records of the corporations through an audit which would, one, reconcile the cash accounts, two, certify as to the genuineness of the accounts payable and receivable shown upon the balance sheet and reflected by the books of the corporations, three, report the cost of the tangible property of the corporations and the reserve set up for depreciation and, four, verify the liabilities "as being truly reflected" on the balance sheets. It was contemplated that the auditors would ascertain the genuineness of the accounts payable and accounts receivable, reflected on the books and records, but beyond that it did not contemplate an inquiry as to undisclosed assets, that is, assets not reflected by the balance sheets or the corporate books or records, or as to undisclosed liabilities, that is, liabilities not disclosed by the balance sheets or corporate books or records.

In a sale transaction of the kind involved in the instant case, there would likely be unknown liabilities and unknown assets, which the books and records of the corporations would not reflect. Since the sale price was based upon the financial condition of the corporations as of June 30, 1955, it was reasonable to assume that the parties intended to make provision with respect to the effect to be given to undisclosed liabilities and undisclosed assets. One liability which might arise and not be disclosed by the books and records and the audit would result from additional tax liabilities asserted after the audit was completed. It is obvious that the parties deemed it desirable to make specific provision indemnifying the buyers against loss arising from tax liabilities not disclosed by the balance

sheets and audit, rather than to leave such liabilities to the general language in the closing portions of Paragraph 8.

The parties being unwilling to leave tax liabilities to the general provisions, first made special provision with respect thereto in Paragraph 8 and then in the last two sentences of Paragraph 8 they dealt generally with undisclosed assets and undisclosed liabilities or deficiencies in assets. If they had intended the phrase "undisclosed liabilities" in the sentence second from the last in Paragraph 8 to be limited to tax liabilities, we think they would have used the phrase "tax liabilities." Instead, they used the broad phrase "undisclosed liabilities or deficiencies," clearly intending, we think, to cover liabilities or deficiencies in assets not disclosed on the balance sheets or in the books and records of the corporations. It is inconsistent, we think, to contend that the phrase "undisclosed liabilities" should be limited to tax liabilities, while the phrase "undisclosed assets" in the same sentence should be broadly construed.

Accordingly, we conclude that the last two sentences of Paragraph 8, read in the light of the entire contract, plainly and without ambiguity provided for the effect to be given to undisclosed liabilities and undisclosed assets, generally, that were not reflected by the balance sheets, books and records and were not restricted to tax liabilities or tax refunds.

It is true that the audit mentioned the Gallagher account and stated that the account was in dispute. However, it left the amount due to future ascertainment and did not undertake to report as to the genuineness of the Gallagher account, or as to the amount of the undisclosed liability to Gallagher. Events subsequent to the audit disclosed that there was a liability to Gallagher in the amount of $10,311.36. Since the Gallagher liability was not disclosed by the books, records or balance sheets and was not determined by the audit, but was left to future determination, and

since subsequent events determined that the amount thereof was $10,311.36, we think the court properly took it into consideration in determining the amounts due to Dipo and Lilenquist.

The judgment is affirmed.