**HOMESTAKE–SAPIN PARTNERS,**
Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 8527.

United States Court of Appeals
Tenth Circuit.

Jan. 16, 1967.

Rehearing Denied March 13, 1967.

Harry L. Bigbee, Santa Fe, N. M. (G. Stanley Crout, Santa Fe, N. M., with him on brief), for appellant.

William Massar, Washington, D. C. (Richard C. Pugh, Lee A. Jackson, Harold C. Wilkenfeld, Washington, D. C., John F. Quinn, Jr., Ruth C. Streeter, Albuquerque, N. M., with him on brief), for appellee.

Before MURRAH, Chief Judge, and LEWIS and BREITENSTEIN, Circuit Judges.

MURRAH, Chief Judge.

This appeal presents the question whether the United States or Homestake-Sapin Partners is entitled to the proceeds of settlement of four civil actions brought by them as co-plaintiffs to recover taxes paid by Homestake under the New Mexico Emergency School Tax Act, 10 N.M.Stat.Anno.1953, §§ 72–16–1 to 72–16–47. The court granted summary judgment for the United States. For reasons hereinafter set forth, we think the court was clearly right.

A history of the litigation is essential to a proper understanding of our decision.

The Atomic Energy Commission contracted to buy uranium concentrate from several processors, among them Homestake-Sapin Partners and Homestake-New Mexico Partners.[1] The contracts covering the period in question, from approximately August 1, 1958, to April 1, 1962, all provided:

"1. Except as otherwise expressly provided herein the contract price is deemed to include all Federal, State and local taxes (including fees and charges), which would be payable in respect of this contract if no interest of the Federal Government were involved * * *.

"2. The Contractor agrees to credit toward payment of the contract price or to pay to the Commission the amount of any such Federal, State or local tax which, in consequence of a constitutional or statutory immunity or exemption under Federal, State, or local law based upon the direct or indirect relationship of the subject matter of this contract to the Atomic Energy Commission or the United States of America (hereinafter referred to as a 'precluded tax'), is either not paid or, if paid, is refunded, rebated, or credited for the benefit of the Contractor. * * * *"

The contracts also gave the Commission the right to designate a "precluded tax", to direct the contractor to seek exemption from it, to direct that action be taken to preserve the right to a refund if exemption were refused, and to request the contractor to join with the Commission in a suit to recover such taxes for the benefit of the Commission. Finally, that part of the contract which became operative after April 1, 1962, gave the contractor the right to seek recovery for its own benefit of precluded taxes paid after that date. In other words, from and after April 1, 1962, the United States had no interest under the contract in so-called "precluded taxes".

New Mexico Emergency School Taxes were designated "precluded" and the contractors directed to pay them under protest. In June, 1960, six suits were brought in New Mexico federal court all seeking to recover precluded taxes paid

---

1. Homestake-Sapin Partners is the successor in interest to the rights of Homestake-New Mexico Partners; Homestake-Sapin's rights as primary contractor and as successor in interest will be treated together.

through March, 1960; Homestake-Sapin was a co-plaintiff with the United States in one action, and Homestake-New Mexico co-plaintiff in a second. The suits invoked the tax provisions of the contracts and alleged that the taxes were unconstitutionally exacted because they discriminated against the United States and those with whom it deals and because they violated the intergovernmental immunity of the United States and its agencies from taxation by the states, and that the contractor was obligated to reimburse the Commission for any protested taxes which might be recovered. These six actions were dismissed for lack of jurisdiction on the ground, among others, that the United States was not a real party in interest. One of the six suits was appealed, apparently to test the jurisdictional question.[2] This court reversed holding that the United States was the real party in interest and remanded the case with directions to entertain suit. United States v. Bureau of Revenue of State of New Mexico, 10 Cir., 291 F.2d 677.[3] Meanwhile, six similar actions were filed in New Mexico state court to recover taxes paid following the period embraced by the federal actions, i. e. April 1, 1960, to April 1, 1962. Again, Homestake-Sapin was co-plaintiff with the United States in one action and Homestake-New Mexico was co-plaintiff in the other. These six federal actions and six state actions will hereinafter be referred to as the twelve joint suits.

In June, 1962, Homestake filed a state court action to recover taxes paid after April 1, 1962 (this action was brought by Homestake alone and for its own benefit since, as previously noted, the United States had no claim under the contract for taxes paid after April 1, 1962; the asserted ground of invalidity was that the mining and processing tax discriminated against Homestake). This suit was never litigated; instead, the court entered judgment on the basis of a "Consent to Judgment" executed by Homestake and an "Admission of Facts" executed by the State. This judgment recited that the taxes in question were constitutionally levied, but that Homestake erroneously overpaid the privilege tax on mining and processing imposed by §§ 72–16–4.2, 72–16–4.3, when it paid on the basis of gross receipts from sales of ore and not on the basis of gross receipts attributable to mining and processing, i. e. the value added to the ore in place by performance of the mining and processing operations. The agreed judgment awarded Homestake a refund of 50% of the taxes involved in that suit.

After this judgment was entered, the six federal joint suits came on for trial pursuant to remand on stipulated facts before a specially constituted three judge court. The trial resulted in a second dismissal, United States v. Bureau of Revenue of State of New Mexico, D.C., 217 F.Supp. 849, on two grounds. First, the court reasoned that the only rights possessed by the United States were acquired by subrogation when it reimbursed Homestake for the taxes it had paid; it further reasoned that Homestake had no standing " * * * to challenge the tax and assert a right of refund on account of discrimination against the United States * * *"; therefore, the United States could not assert the unconstitutionality of the tax because Homestake had no standing to do so and the United States as subrogee could not rise above the rights of its subrogor.[4] The second ground was that

2. Originally notice of appeal was filed in all six actions. However, since the six were tried together and treated at all times as identical, it was agreed to appeal only one and for the rest to be bound by the determination in that appeal.

3. If, as we held, the United States is the real party in interest in the six federal joint suits, it is difficult for us to perceive how Homestake can now assert a claim to the settlement proceeds. The United States, however, has not asserted res judicata or collateral estoppel, and we do not consider it here.

4. In circumstances similar to those here we had occasion to consider and assess the

§ 72–16–28 barred suit to recover any taxes paid more than four months before filing of the complaints (this apparently included the great majority of taxes involved in the six federal actions).

While the appeal of this decision was pending, the United States and New Mexico entered into settlement negotiations with respect to all twelve joint suits. A settlement of $1.25 million, or 47% of $2.6 million in taxes involved in the twelve joint suits was acceptable to both sides. However, Homestake refused to sign the documents necessary to consummate the proposed settlement because included was a document reciting that Homestake was entitled to no part of the settlement proceeds. Thereafter, Homestake and the United States made a separate agreement whereby they agreed to accept and consummate the proposed settlement, and to escrow the approximately $227,000 attributable to the four joint suits in which Homestake-Sapin or Homestake-New Mexico was a party pending determination of their respective rights to the settlement fund in this suit. The agreement specifically provided that "No plaintiff shall be deemed (by reason of having participated in the acceptance and consummation of any of said settlement offers or having entered into this stipulation) to have admitted or recognized that the plaintiff claiming adversely to it is entitled to any part of any settlement proceeds."

Pursuant to this agreement, the United States brought this suit against Homestake alleging the terms of the contract tax provisions, that it had designated the "precluded taxes" in question, that the only ground of invalidity alleged in the suits was the unconstitutionality of the taxes, and that the complaints in the four joint suits specifically alleged that Homestake was obligated to reimburse the United States for any such taxes refunded.

Homestake answered admitting all the allegations of the United States' complaint except that it denied that unconstitutional invalidity was the only ground alleged in the four joint suits to which it was a party. As to that, it affirmatively alleged that the settlement was not based on precluded tax claims, but instead on erroneously computed and overpaid claims to which it alone was entitled; that the taxes were not "precluded" within the meaning of the contract but were in fact nondiscriminatory and constitutional, i. e. constitutionally exacted but erroneously computed; that the United States owed and breached a fiducial obligation to recover the overpayments for the benefit of Homestake and was estopped to assert a claim to the escrowed fund. Homestake also counterclaimed alleging in substance the same claims made in its affirmative defenses.

Both sides submitted affidavits and documents to the court and moved for summary judgment. The court granted summary judgment in favor of the United States and awarded it the entire escrowed fund.

Homestake's first ground for reversal is based upon its first alleged defense, i. e. that the fund in suit represents a settlement of claims for taxes constitutionally exacted but erroneously computed and overpaid, not settlement of precluded tax claims. It points to the 1962 state court judgment which recited Homestake had overpaid its taxes and argues that New Mexico was ready to refund approximately 50% of the taxes involved in the twelve joint suits on the basis of the 1962 judgment; that the attorneys for the United States were aware of this but decided to try for a 100% recovery in the three judge case; and that upon dismissal of that case the United States decided to settle for the 50% it knew was available because of the 1962 consent judgment. On this postulate Homestake contends that the settlement which produced the fund in suit was based upon an overpayment claim, not a precluded tax claim.

holding in this three judge case in light of our holding in United States v. Bureau of Revenue of State of New Mexico, 10

Cir., 291 F.2d 677. See Marquardt Corp. v. Weber County, 10 Cir., 360 F.2d 168, 171.

This contention must necessarily be resolved by an interpretation of the settlement agreements which produced the fund. These agreements were denominated "Stipulation of Settlement and Discontinuance" and were executed by Homestake-Sapin and the United States in each of the four actions. They provided that "The parties to the above entitled action * * * hereby agree and stipulate that the action is settled and discontinued with prejudice * * *". A fifth document entitled "Stipulation of Settlement", purporting to settle all twelve joint actions, provides in its preface that " * * * the parties * * * wish to compromise and settle all the claims of all the plaintiffs alleged and involved in each and all of said actions * * *." [5] If these settlement agreements can be said to be ambiguous as to the claims actually settled and discontinued, the suit was not ripe for summary judgment, for the submitted affidavits indicate a dispute concerning the nature of the claims settled, i. e. whether precluded or overpayment.

■ The settlement stipulations were, of course, contracts. And, if the intent of the parties becomes an issue, it should be gathered from the language of the contract, and resort to extraneous facts is justified only if the contract itself creates an ambiguity; ambiguity justifying extraneous evidence is not generated by the subsequent disagreement of the parties concerning the meaning of the contract. See Greer v. Stanolind Oil and Gas Co., 10 Cir., 200 F.2d 920, 922; United States ex rel. Moseley v. Mann, 197 F.2d 39; Filtrol Corp. v. Loose, 10 Cir., 209 F.2d 10; Kohler, Stover & Ivey v. City of Tulsa, 10 Cir., 214 F.2d 946; Dipo v. Ringsby Truck Lines, 10 Cir., 282 F.2d 126; Cf. Evensen v. Pubco Petroleum Corp., 10 Cir., 274 F.2d 866.

■ The suits were founded in the uranium contracts between Homestake-Sapin and the government which defined precluded taxes in terms of unconstitutional taxes and provided that Homestake-Sapin would bring suit to recover designated precluded taxes. As we have seen, twelve such suits were instituted to recover precluded taxes as defined in the contract (in four of these suits Homestake-Sapin was a co-plaintiff). In none of the suits was the claim made that the taxes sought to be recovered were erroneously computed and overpaid. The sole and only ground for recovery was unconstitutional exaction.

The settlement agreements which we interpret necessarily derive their content and meaning from the claims in the suits they settled. When these agreements are viewed in the light of the unequivocal nature of the suits they settled, their meaning and purpose becomes too plain for doubt. In this posture of the case extrinsic evidence is inadmissible, and the case is ripe for summary judgment on the overpayment issue.

We hold that the settlement agreements denominated "Stipulations of Settlement and Discontinuance" and "Stipulation of Settlement" settled the claims in the suits for unconstitutional exaction of taxes which were designated in the suits as precluded taxes.

■ Homestake-Sapin next asserts that even though the agreements settled no overpayment claim, the United States was nevertheless aware of the force and effect of the 1962 judgment and New Mexico's willingness to settle these claims on the basis of that judgment. In other words, the argument is that New Mexico was willing to settle the claims for unconstitutional exactions according to the overpayment formula utilized in the 1962 judgment. On this hypothesis it argues that the United States owed a fiducial obligation to protect Homestake-Sapin's interest under color of the 1962 judgment and is now

---

5. As previously noted, Homestake refused to sign any of the documents of settlement, including this one, when they were first submitted to it. The United States in its brief says Homestake never did sign this stipulation applicable to all twelve actions, and Homestake did not dispute this in its brief or on oral argument.

estopped to assert a claim to the escrowed fund. The short answer is that the United States was not obligated to recover overpayments for Homestake-Sapin. On the contrary, Homestake-Sapin was obligated to recover unconstitutionally precluded taxes for the United States. And, as we have seen, such was the purpose of the suits which were settled. There is no indication that the United States in any way prevented or interfered with Homestake-Sapin's right to assert an overpayment claim for any period in question in these or any other suits. In these circumstances we see no basis upon which to hold that the United States owed or breached a duty to recover for Homestake any overpayments or to estop the United States from asserting a claim to the escrowed fund.

This brings us to Homestake's contention that even if, as we hold, the settlement involved only claims for unconstitutionally exacted taxes, the claims were nevertheless not for "precluded taxes", as that term is used in the contracts.[6] As we understand the contention, it is that the uranium contract precluded only taxes unconstitutional under the intergovernmental immunity doctrine; that discriminatory taxes do not derive their unconstitutionality from the intergovernmental immunity doctrine and are, therefore, not precluded under the contract.

As we have seen, "precluded taxes" as defined in the contract are those refunded " * * * in consequence of a constitutional or statutory immunity or exemption under Federal, State, or local law based upon the direct or indirect relationship of the subject matter of this contract to the Atomic Energy Commission or the United States of America * *." Homestake takes the position that "constitutional immunity" as used in the contract refers to intergovernmental immunity under the supremacy clause and not to discrimination against the United States and those with whom it deals which it says derives from the Fourteenth Amendment.

Whether a tax discriminatory against the United States is unconstitutional under the Fourteenth Amendment, the supremacy clause, or both, is a question the Supreme Court has not had occasion to answer. See discussion in Comptroller of Treasury, Retail Sales Tax Div. v. Pittsburgh-Des Moines Steel Co., 231 Md. 132, 189 A.2d 107. Chief Justice Warren in Phillips Chemical Co. v. Dumas School District, 361 U.S. 376, 385, 80 S.Ct. 474, 480, 4 L.Ed.2d 384, involving discriminatory taxes levied against lessees of government property, intimates that unconstitutionality in discrimination cases stems from the supremacy clause when he says, " * * * we have made it clear, in the equal protection cases, that our decisions in that field are not necessarily controlling where problems of intergovernmental tax immunity are involved. * * * But where taxation of the private use of the Government's property is concerned, the Government's interests must be weighed in the balance. Accordingly, it does not seem too much to require that the State treat those who deal with the Government as well as it treats those with whom it deals itself." And, he concludes by saying, "As we had occasion to state, quite recently, it still remains true, as it has from the time of M'Culloch v. State of Maryland, 4 Wheat. 316, 4 L.Ed. 579, that a state tax may not discriminate against the Government or those with whom it deals." Id. 387, 80 S.Ct. 481. These statements would seem to indicate that the discrimination doctrine as applied to the United States and those with whom it deals has its roots in the supremacy clause, although the standards applied are similar to those

6. Initially Homestake-Sapin argues that the taxes were in fact non-discriminatory under applicable New Mexico statutes (72–16–4.2, 72–16–4.3 and 72–16–5 as amended), especially after April 1, 1961, when § 72–16–5 was amended to remove discriminatory features. But, in the view we take of the case, our only inquiry now is who is entitled under the contract to a settlement based solely on claims for unconstitutional exactions. Whether the taxes were in fact discriminatory is irrelevant to that inquiry.

dictated by the equal protection clause. In any event we find it unnecessary to decide this question in this case.

 We think the language of the tax provision clearly indicates that unconstitutionally discriminatory taxes were intended to be treated as "precluded". The contract certainly does not expressly limit "precluded taxes" to those from which the United States is immune because levied directly on it or its agency. On the contrary, since taxes exempted because of the "indirect" relationship of the subject matter of the contract to the United States are "precluded", unconstitutionally discriminatory taxes would seem to come well within the purview of that term. We do not think the drafters of this contract intended to draw a distinction between an unconstitutionally discriminatory tax and one from which the United States is immune under the supremacy clause, when, as we have seen, authoritative case law does not attempt to make such a distinction.

We conclude that the claims on which suit was brought and settlement made were precluded tax claims within the meaning of the contract.

The judgment is affirmed.

DAVID T. LEWIS, Circuit Judge (concurring).

In determining the rights of rival claimants to a fund created by a compromise of a filed law suit it is indeed fundamental that first inquiry should be made through the contract of settlement which, if certain and unambiguous, would control. In the case at bar the contract of settlement unambiguously settles *all* claims of both Homestake and the United States against the State of New Mexico. And the undisputed facts show that the claims of Homestake and the United States against each other and to the fund were intended to be and were specifically preserved in the settlement proceedings. I can accord no further dispositive legal significance to the nature of the filings or the settlement agreements. The United States is entitled summarily to succeed now because it was entitled to succeed in the law suit that was settled. As Chief Judge Murrah clearly points out, the subject tax imposition by New Mexico was, as a matter of law, a "precluded tax" within the meaning of the parties' contract. The claim of the United States to the disputed fund thus has merit in law and the claim of Homestake is without merit. There is no factual dispute involving intent nor contractual relationship existing between these parties that prevents summary disposition.

BREITENSTEIN, Circuit Judge (concurring).

In my opinion a case of the complexity of this should not have been decided on a motion for a summary judgment. My associates do not agree and I accept their judgment. The result reached is correct because the tax was precluded and the United States was entitled to recover in the settled suits. Indeed, it was entitled to recover substantially more than the amount paid in settlement.