387 F.2d 155
 SOCONY MOBIL OIL COMPANY, Inc., a New York Corporation, Appellant,
v.
HUMBLE OIL & REFINING COMPANY, a Delaware Corporation
(substituted for Wasatch Development Company, a
Colorado Corporation), Appellee.
 No. 9258.
 United States Court of Appeals Tenth Circuit.
 Nov. 29, 1967.
 
 John R. Evans, of Haskell, Helmick, Carpenter & Evans, Denver, Colo. (Richard R. Helmick, Denver, Colo., Jack E. Earnest, New York City, and Burns H. Errebo, Denver, Colo., with him on the brief), for appellant.
 Fred Winner, of Winner, Berge, Martin & Camfield, Denver, Colo. (William S. Livingston, Denver, Colo., with him on the brief), for appellee.
 Before PICKETT, HILL and HICKEY, Circuit Judges.
 PICKETT, Circuit Judge.
 
 
 1
 This appeal challenges the construction of an Option Agreement between General Petroleum Corporation and Wasatch Development Company relating to unpatented oil shale mining claims in western Colorado. Socony Mobil Oil Company, which succeeded to the rights of General, brought suit against Wasatch in the United States District Court for the District of Colorado, to enforce its right to purchase the claims covered by the agreement. Prior to trial, Humble Oil and Refining Company succeeded to the rights of Wasatch and was substituted as defendant. The trial court construed the Option Agreement in favor of Humble, holding that Socony Mobil's attempt to exercise the option was ineffective and that the agreement was terminated.
 
 
 2
 Wasatch, a corporation the stock of which was closely held by the family of Joe T. Juhan, owned a large number of unpatented oil shale claims in Rio Blanco and Garfield Counties, Colorado. On November 19, 1958, after considerable negotiation and redrafting, General and Wasatch entered into an Option Agreement which provided in part:
 
 
 3
 '4. When United States patents have issued on lands subject hereto having a total value of not less than $428,000.00 (determined in accordance with paragraph 3 hereof), Wasatch shall give General written notice of such fact and General, for a period of thirty days from the receipt of such notice, shall have the exclusive right and option to acquire all of the lands subject to this agreement upon agreeing to pay therefor a total purchase price equal to the value thereof (approximately $2,452,000.00). If General exercises said option by giving written notice thereof to Wasatch within such thirty-day period, Wasatch shall have the continuing duty to convey to General by warranty deed all of said lands on which patents are then issued or thereafter issue. Each warranty deed shall convey to General title to all minerals (an undivided one-half in the case of the Sunset-Gabbs Block) in the lands covered hereby in fee simple, together with the right to remove and extract such minerals and such surface rights as are included in said United States patents.
 
 
 4
 '5. The total purchase price as aforesaid shall be paid as follows:
 
 
 5
 (a) the payment of $278,000.00 referred to in paragraph 1 hereof shall be credited against the purchase price unless General shall have exercised the right to apply such payment as provided in paragraph 6 hereof.
 
 
 6
 (b) the balance of $2,174,000.00 shall be payable in thirteen annual installments of $150,000.00 each and a fourteenth annual installment of approximately $224,000.00, all without interest. The first such installment shall be due upon the exercise of this option by General and the succeeding installments shall be due on the first day of February in the following calendar year and in succeeding calendar years.
 
 
 7
 To the end that General shall not be obligated to pay for lands which have not been patented and conveyed to it, until such lands are patented and conveyed, it is agreed that if, at the time any payment is due Wasatch hereunder, lands shall have been patented and conveyed to General which have a value less than all payments previously made Wasatch hereunder plus the amount of the payment then to be made, the portion fo such payment which would be so in excess shall be deferred until additional lands equal in value to the amount of the excess shall have been so patented and conveyed to General.
 
 
 8
 '6. In the event that patents have not issued on lands subject to this agreement aggregating in value $428,000.00 and Wasatch shall not have given to General notice thereof on or before October 1, 1964, or if General has not theretofore elected to exercise its option hereunder, then Wasatch shall return to General the sum of $278,000.00 on or before October 1, 1964.'
 
 
 9
 Thereafter, Wasatch proceeded to file patent applications on many of the claims covered by the Option Agreement, but due to the policy of the Department of the Interior not to issue oil shale patents, no additional claims came to patent. No claim is made that Wasatch did not exercise diligence and good faith in attempting to secure the patents.
 
 
 10
 In February, 1964, Socony Mobil notified Wasatch that it desired to waive the contract requirement that patents issue on lands having a total value of $428,000 and to exercise the option immediately. No offer was made to pay the $428,000. Wasatch advised Socony Mobil that, under the terms of the agreement, it did not have the right to exercise the option at that time. Socony Mobil thereupon instituted this action for a declaratory judgment pursuant to 28 U.S.C. 2201 and Rule 57, F.R.Civ.P., seeking construction and interpretation of the Option Agreement and a declaration that its exercise of the option to acquire the claims was effective. Socony Mobil's motion for summary judgment was denied, and trial was had to the court. Throughout the proceedings Socony Mobil has contended that the Option Agreement granted it the right, at its election to effect purchase of oil shale claims at any time after execution of the agreement and up to thirty days after notice from Humble that patents had been secured on lands aggregating $428,000 in value. It has been Humble's position that Socony Mobil had no exercisable option whatsoever until and unless patents had been secured on lands aggregating $428,000 in value, and only then if such event occurred prior to October 1, 1964. The trial court determined that the issuance of patents on land aggregating $428,000 in value, in accordance with the contractual formula, was a condition precedent to the existence of the option; that this condition was for the benefit of both parties and could not be waived unilaterally; that Socony Mobil's attempted exercise of the option before the issuance of the minimum number of patents was of no effect.
 
 
 11
 Appellant asserts that the trial court erred in denying its motion for summary judgment, that the Option Agreement was clear and unambiguous and susceptible of interpretation without resort to extrinsic evidence. Ordinarily, the construction of a contract presents a question of law to be determined by the court. Tenneco Oil Co. v. Gaffney, 10 Cir., 369 F.2d 306. It is fundamental that a contract shall receive that interpretation which would best effectuate the manifest intention of the parties. Tenneco Oil Co. v. Gaffney, supra. In the absence of ambiguity, the intention of the parties must be ascertained from the written instrument itself. Dipo v. Ringsby Truck Lines, 10 Cir., 282 F.2d 126; Filtrol Corp. v. Loose, 10 Cir., 209 F.2d 10. However, where there is ambiguity or lack of clarity, the court may look beyond the written instrument and resort to extrinsic evidence to ascertain the true meaning of the contract. Filtrol Corp. v. Loose, supra; Carter Oil Co. v. McCasland, 10 Cir., 190 F.2d 887, cert. denied 342 U.S. 870, 72 S.Ct. 113, 96 L.Ed. 654, rehearing denied 342 U.S. 899, 72 S.Ct. 231, 96 L.Ed. 673. See, also, Bardwell v. C.I.R., 10 Cir.,318 F.2d 786. A contract is ambiguous if after a consideration of the entire instrument, the provisions in controversy are susceptible of more than one meaning. Dipo v. Ringsby Truck Lines, supra; Franklin v. American Nat'l Ins. Co., 10 Cir., 135 F.2d 531. The parties agree that General was not interested in the purchase of unpatented claims. If we accept Socony Mobil's version of the contract, then General had the absolute right to exercise the option at any time after its execution, without any limit on time and without the payment of any additional money unless patents on claims of the value of $428,000 were obtained before October 1, 1964. Humble argues that it was the intention of the parties that the period of approximately 6 years provided for in paragraph 6 of the contract was for the purpose of terminating the contract if no substantial progress was made in obtaining patents. The meaning of the Option Agreement, which was admittedly inartfully drawn as to the time when the option could be exercised, is ambiguous and controverted. Accordingly, the trial court, presented with a genuine issue as to a material fact, did not err in denying Socony Mobil's motion for summary judgment, and in allowing the matter to proceed to trial. Rule 56(c), F.R.Civ.P.
 
 
 12
 It is contended that the evidence is not sufficient to support the trial court's construction of the Option Agreement. The court's critical findings are:
 
 
 13
 '9. In the course of these meetings, the parties decided that they were not interested in the sale and purchase of a few isolated oil shale claims, and that they wished to accomplish a sale of economic block. It was the intent of the parties that General should have no obligation to buy and Wasatch should have no obligation to sell unless an economic block of patents could be obtained; that $428,000.00 worth of patents would represent an economic block, and that no obligation to buy or sell could come into existence unless at least $428,000.00 worth of the claims were patented before October 1, 1964.
 
 
 14
 '11. The parties intended that General Petroleum Corporation would have a 30-day option to acquire the lands in question when, but only when, patents issued to a minimum amount of $428,000.00 worth of lands and when Wasatch had given notice thereof to General, all by October 1, 1964. When patents on subject lands aggregating $428,000.00 in value had issued, and Wasatch had given General notice thereof on or before October 1, 1964, General had an exclusive option for a thirty-day period, which is could exercise by giving written notice to Wasatch. * * *'
 
 
 15
 At the trial, both W. P. Carver, who negotiated the Option Agreement for General, and Edward Juhan, who had represented the Wasatch interests, testified as to the Circumstances surrounding the Option Agreement and their respective understandings of its meaning. Juhan testified that neither General nor Wasatch wanted to own isolated parcels of oil shale land inasmuch as an economic block of several parcels is necessary before development of the claims becomes economically feasible; and that it was therefore decided, for the mutual benefit of both parties, that the option would be conditioned upon the issuance of patents on land aggregating $428,000.00 in value.[1]
 
 
 16
 After reviewing the record, we are satisfied that the court's findings are well supported by the record and are, therefore, not clearly erroneous. Rule 52, F.R.Civ.P.; Glens Falls Ins. Co. v. Newton Lumber & Mfg. Co., et al., 10 Cir., 388 F.2d 66 (Filed 10/24/67); System Investment Corp. v. Montview Acceptance Corp., 10 Cir., 355 F.2d 463. And since, as the trial court found, the provisions of paragraph 4 of the contract were inserted for the mutual benefit and protection of both contracting parties, it cannot be waived unilaterally by one party as against the rights of the other. Campbell v. Richards, 352 Mo. 272, 176 S.W.2d 504; Hittson v. Chicago, R.I. & P. Ry. Co., 43 N.M. 122, 86 P.2d 1037; 17A. C.J.S. Contracts 491(a); Cf. Smallwood v. McGraw, 8 Cir., 42 F.2d 74.
 
 
 17
 Appellant places considerable emphasis on paragraph 6 of the Option Agreement, as set forth hereinabove. It is urged that the phrase '* * * or if General has not theretofore elected to exercise its option hereunder * * *' means that it has an option to purchase the oil shale claims whether or not patents thereon had issued. In the event patents valued at $428,000 were obtained before October 1, 1964, General was required to determine whether it desired to exercise its option. Paragraph 6 apparently anticipated such a situation as it referred to the right to the return of the initial payment of $278,000 if the deal had not been previously consummated. It is further argued that the trial court erroneously concluded that the contract terminated on October 1, 1964. It is agreed that patents on land aggregating $428,000 in value did not issue prior to October 1, 1964. Wasatch tendered to Socony Mobil the sum of $278,000, and this tender was rejected. The trial court held that Socony Mobil had no remaining rights under the Option Agreement except to recover the $278,000 advanced by it to Wasatch. We have considered the entire record and are satisfied that the trial court's construction of the Option Agreement is consistent and reasonable, and the contract terminated with the failure to obtain the required number of patents before October 1, 1964.
 
 
 18
 Affirmed.
 
 
 
 [1]
 Juhan testified as follows:
 'When we started on another draft we discussed the description in this draft and I made the comment at that time that I didn't think the Carbon No. 7 and 8, which were patented mining claims, should be included in the description in this contract and I suggested to them at that time that we give them a separate conveyance of Carbon No. 7 and 8, which was our one-third interest in these patented mining claims, and they, in return replied to me that they--
 Q. Who replied? A. Well, Mr. Ketchum(?), as I recall, and Mr. Landon and Mr. Lavenant and myself were discussing this.
 Q. Who is Mr. Ketchum? A. George Ketchum was the assistant, I believe, at that time to Mr. Carver. At any rate, we discussed this situation and after my offer to them to convey them the Carbon 7 and 8, they said 'We don't want the Carbon 7 and 8 at this time because it wouldn't make an economic block to us. We don't want a bunch of isolated claims because we can't use it economically.
 Mr. Evans: Who is saying this, if I may inquire? A. Who said that to me?
 Mr. Evans: Yes, who is saying this? A. Well, Mr. Landon or Mr. Ketchum, either, said that, one or the other said that to me. I have discussed what an economic block was and they said, 'Well, it would have to approximate 3,000 acres before we could be able to economically develop this thing. And because it has to be 3,000 acres in a compact block, we don't want to be forced to buy a few isolated claims on it' and, by the same token, I said to them 'That is fine; we don't want to have to sell a bunch of isolated blocks or isolated claims because we can't find anybody that will buy our property if we have a bunch of isolated claims, so naturally, we want to keep them in a block too.' * * *
 Q. Mr. Juhan, was there any discussion as to whether, as to circumstances under which General Petroleum could exercise an option? A. There was no discussion that they could exercise their option in the manner they attempted in this case.
 Q. How could they have exercised it? A. It was my understanding of the contract that they could exercise their option when $428,000.00 worth of patents issued.
 Q. Let's say $428,000.00 worth of patents did not issue but they were willing to pay $428,000.00. A. Well, if they wanted to pay $428,000.00 and go ahead and exercise their option, in all probability we would have said, 'That is fine, because if you want to pay $428,000.00, why, we will waive our beneficial rights in this economic block too.'
 * * * Q. Mr. Juhan, was there any discussion as to whether, as to circumstances under which General Petroleum could exercise an option? A. There was no discussion that they could exercise their option in the manner they attempted in this case.
 Q. How could they have exercised it? A. It was my understanding of the contract that they could exercise their option when $428,000.00 worth of patents issued.
 Q. Let's say $428,000.00 worth of patents did not issue but they were willing to pay $428,000.00. A. Well, if they wanted to pay $428,000.00 and go ahead and exercise their option, in all probability we would have said, 'That is fine, because if you want to pay the $428,000.00, why, we will waive our beneficial rights in this economic block too.'
 Q. In other words, was it your intent and understanding of the contract that you were to get a minimum amount of $428,000.00 before you were required to convey any patents or before they could exercise their option? A. That was my understanding, yes.
 Q. And was that the sense of the discussions which were had out there? A. That is correct. * * *
 * * * When we got down to Los Angeles and started discussing these things, these various ideas came out and, as I said before, the economic block theory came out and, as I said before, they didn't want to buy this unless they had enough patents to assure themselves they were going to be able to develop it and we didn't want to sell it in isolated tracts, either, because we couldn't sell it to anybody else if we did that, because their blocks would be cut up into isolated tracts, and that was our concept and that was our thinking on it and that was how this thing came together.'